**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| INVIVO THERAPEUTICS CORPORATION, *et al.*,[1] | Case No. 24-10137 (___) |
| Debtors. | (Joint Administration Pending) |

**DECLARATION OF RICHARD CHRISTOPHER IN SUPPORT OF THE DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Richard Christopher, hereby declare as follows:

1. I am the Chief Financial Officer and Treasurer of InVivo Therapeutics Holdings Corp. and its wholly-owned subsidiary InVivo Therapeutics Corporation (collectively "InVivo"), the above captioned debtors and debtors-in-possession (the "Debtors"). I was appointed to those roles in January 2019. In that capacity, I am familiar with the Debtors' business, day-to-day operations and financial affairs.

2. In the decades prior to working for the Debtors, I held positions at other life sciences companies. I served as the Chief Financial Officer of iCAD, Inc., a Nasdaq-listed company with a focus on therapies and solutions for the early identification and treatment of cancer, from December 2016 through January 2019. Prior to iCAD, Inc., I was Chief Financial Officer from March 2014 through December 2016 and Chief Operating Officer from October 2015 through December 2016 of Caliber Imaging & Diagnostics, Inc., a medical technology company focused on cancer detection imaging solutions, with primary applications in dermatology. Prior to Caliber

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: InVivo Therapeutics Corporation (6670) and InVivo Therapeutics Holdings Corp. (8166). The Debtors' mailing address is 1500 District Avenue, Burlington, MA 01803.

and starting in 2000, I held various positions of increasing responsibility at DUSA Pharmaceuticals, Inc., a Nasdaq-listed dermatology company focused on the treatment of precancerous skin lesions, where I ultimately served as Chief Financial Officer from January 2005 through its acquisition and integration into Sun Pharmaceuticals Industries Ltd in April 2013. I hold a Master of Science in Accounting from Suffolk University and a Bachelor of Science in Finance from Bentley University.

3. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") and filed various motions described herein requesting certain relief in connection with the Chapter 11 Cases (collectively, the "First Day Pleadings"). I submit this declaration (this "Declaration") in support of the Debtors' Chapter 11 Cases and the First Day Pleadings.

4. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (a) my personal knowledge gained in my capacity as an officer of InVivo, (b) information provided to me by other members of InVivo's management team, including those under my supervision, (c) my review of relevant documents, and/or (d) my experience and knowledge of InVivo's operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth in this Declaration.

5. Part I of this Declaration contains an overview of the rationale for these Chapter 11 Cases. Part II describes the Debtors' business, Part III describes in more detail the circumstances giving rise to the commencement of these Chapter 11 Cases and certain of the Debtors' prepetition

wind-down efforts, Part IV describes the Debtors' proposed course for these Chapter 11 Cases, and Part V sets forth certain facts in support of the First Day Pleadings.

## I. OVERVIEW

6. These Chapter 11 Cases are focused on finalizing the wind-down of InVivo's business. Like many developmental life sciences companies in the current market environment, InVivo has been unable, despite sustained efforts over a long course of time, to achieve meaningful clinical outcomes to support the continued pursuit of its Neuro-Spinal Scaffold device for development and ultimate commercialization in the area of spinal cord injury treatment. Over the same period of time, InVivo has been unable to attract or acquire new assets to support its continued operation. While InVivo has made significant advancements in its field over the past twenty years, those advancements have not resulted in a financially viable business moving forward. As a result, InVivo has pivoted to a wind-down strategy that it believes will result in the satisfaction of all creditor claims in full or nearly in full, in addition to funding all wind-down costs. InVivo is seeking chapter 11 protection to complete this wind-down because it believes the chapter 11 process is the most efficient method of concluding its clinical trials, liquidating its remaining assets and distributing remaining cash and any sale proceeds to creditors and, should there be any excess, to equityholders.

## II. OVERVIEW OF THE DEBTORS' BUSINESS

### *Business Operations and Corporate Structure*

7. InVivo Therapeutics Corporation ("InVivo Corp.") was founded in 2005 as, and remains, a Delaware corporation. InVivo Therapeutics Holdings Corp. ("Holdco") was incorporated on April 2, 2003, under the name of Design Source, Inc. as a Nevada corporation. On October 26, 2010, Holdco acquired InVivo Corp., and InVivo Corp. has, since that time, been a wholly-owned subsidiary of Holdco.

8. InVivo is a research and clinical-stage biomaterials and biotechnology company with a focus on treatment of spinal cord injuries ("SCI"), with the goal of developing treatment options intended to provide meaningful improvement in patient outcomes following SCI.

9. Prior to the Petition Date, InVivo pursued development of its investigational Neuro-Spinal Scaffold implant (the "NSS Implant"), a bioresorbable polymer scaffold that is designed for implantation at the site of injury within a spinal cord and is intended to treat acute SCI. The NSS Implant is intended to promote side-by-side healing by supporting the surrounding tissue after injury, aiming to minimize expansion of areas of necrosis and provide a biomaterial substrate for the body's own healing and repair processes.

10. The NSS Implant incorporates intellectual property licensed under an exclusive, worldwide license from Boston Children's Hospital ("BCH") and the Massachusetts Institute of Technology, the term of which expires in 2027 or the life of the last patent expiration, whichever is later, unless terminated earlier by BCH (the "BCH License"). In connection with InVivo's acquisition of the BCH License, InVivo agreed to a development plan that includes certain targets and projections related to the timing of product development and regulatory approvals, as well as InVivo's payment of certain milestone payments, royalties and other fees.

11. Despite significant investment and promising results in initial clinical trials, InVivo is unable to continue clinical development of the NSS Implant due to setbacks in subsequent clinical trials and financial constraints. In particular, in March of 2023, InVivo announced that data from its most recent and only active clinical trial had failed to meet the pre-defined success criteria and primary endpoint for the study. Having no other program assets besides the NSS Implant that could support continued operations or attract new financing opportunities prior to the Petition Date, InVivo terminated the development of the NSS Implant and pivoted to a wind-down

and asset monetization strategy in order to maximize the value of its enterprise for its constituents, as set forth in greater detail herein.

### *The Neuro-Spinal Scaffold Implant*

12.     Over the course of approximately nine years, InVivo studied the NSS Implant in two clinical trials for patients with acute spinal cord injury. In 2013, the United States Food and Drug Administration (the "FDA") approved InVivo's Investigational Device Exemption application for the NSS Implant, after which, in 2014, InVivo initiated a feasibility human pilot study of the implant. The pilot study was intended to assess the safety and feasibility of the implant and gather preliminary evidence of its potential clinical effectiveness. The pilot study was initially approved for up to 20 clinical sites and enrollment of up to 12 patients, pending review of data from the first five patients enrolled in the trial. In December 2014, the FDA approved an expedited enrollment plan that allowed InVivo to continue enrolling patients more rapidly in the pilot study, barring any significant safety issues. The pilot study was then approved by the FDA for conversion to a pivotal probable benefit study in January 2016 (the "INSPIRE 1.0 Study"), designed to enroll 20 patients, inclusive of the patients that had already been enrolled. As of July, 2017, InVivo had enrolled 19 patients of the target 20 patients in the INSPIRE 1.0 Study, three of whom died from causes unrelated to the NSS Implant as deemed by each clinical site's respective principal investigator. Following the death of the third patient, the INSPIRE 1.0 Study was placed on hold as InVivo engaged in discussions with the FDA. Ultimately, enrollment in the INSPIRE 1.0 Study was closed, but InVivo continued to follow the progress of the 16 remaining participating patients per the study protocol as approved by the FDA.

13.     In February of 2018, InVivo received approval to conduct a second, 20-patient clinical study that included a randomized, concurrent control arm and was designed to include risk mitigation criteria while supplementing the existing clinical evidence gathered from the INSPIRE

1.0 Study (the "INSPIRE 2.0 Study"). The purpose of the INSPIRE 2.0 Study was to assess the overall safety and probable benefit of the NSS Implant. The study was a single blind study, meaning the patients and assessors were blind to treatment assignments.

14. Despite encouraging results from the INSPIRE 1.0 Study, the data from the INSPIRE 2.0 Study (and anticipated final study before any marketing application) did not meet the pre-defined success criteria and primary endpoint for the study. Given the disappointing results from the INSPIRE 2.0 Study and the anticipated length of time and significant resources that it would likely require to run additional and meaningful clinical studies, InVivo decided to halt further development and clinical investigation of the NSS Implant in March of 2023. InVivo then turned to pursue other potential strategies for monetizing its assets for the benefit of its constituents and is currently undertaking activities to wind-down the INSPIRE 1.0 and the INSPIRE 2.0 Studies, in accordance with an Investigational Device Exemption ("IDE") amendment approved by the FDA in August 2023.

### *The Debtors' Cash*

15. As of the Petition Date, InVivo holds approximately $5.4 million in cash in its deposit and investment accounts, consistent with the manner in which it has held its cash through its historic practices. As InVivo has no debt for borrowed funds, there are no liens on any of InVivo's cash, and no person or entity can claim that InVivo's cash is collateral for any indebtedness. InVivo plans to use its remaining cash to finance these Chapter 11 Cases and the continued wind-down of its remaining business. InVivo does not propose to borrow funds under debtor-in-possession financing or otherwise.

### *Secured Debt, Unsecured Debt, and Settled Claims*

16. As noted above, as of the Petition Date, InVivo has no secured debt.

17. Prior to the Petition Date, the Debtors attempted to stay current with all unsecured obligations and to satisfy longer-term contractual obligations. As such, InVivo believes that the only unsecured claims against InVivo as of the Petition Date are as follows: (1) incidental trade and other "ordinary course of business" claim accruals that could not, for operational reasons, be paid in full as of the Petition Date; (2) a residual, subordinated claim of InVivo's former landlord in Cambridge, Massachusetts, which claim was agreed as part of an early termination of the lease; (3) contingent indemnification and related obligations to InVivo's directors and officers and to the contract research organization ("CRO") tasked with winding-down InVivo's clinical trials; and (4) accrued and contingent payment obligations in connection with InVivo's wind-down, in particular, the possible success fee payable to SSG Capital Advisors, LLC ("SSG") upon a closing of the sale of InVivo's assets. Items (2) through (4) are discussed in greater detail in Section II below. As of the Petition Date, there is a reasonable prospect that InVivo will be able to satisfy all claims in these Chapter 11 Cases in full; however, it appears unlikely that any meaningful excess value over the amount of such claims will be available for distribution to equityholders.

***Common Equity, Preferred Convertible Equity, Recent Issuance of Warrants and Related Capital Raising Activity***

18. Since its inception, InVivo has historically financed its operations primarily through the sale of equity-related securities. Holdco is a publicly traded company with 3,105,446 common shares outstanding and trading on the Nasdaq exchange as of the Petition Date. There are no classes of stock outstanding other than common stock. To date, Holdco has never declared or paid cash dividends on its common stock. There are 2,380,394 warrants outstanding as of the Petition Date. The weighted average exercise price of the warrants is $10.37. Almost all (2,379,884 or 99.98%) of the outstanding warrants are significantly "out of the money" with Holdco shares closing at $0.674/share as of market close on January 30, 2024.

## III. EVENTS LEADING TO THESE CHAPTER 11 CASES

### *NSS Implant Setbacks and Decision to Suspend Development*

19. As discussed above, InVivo initiated the INSPIRE 1.0 Study in 2014, which was designed to enroll 20 patients. Despite encouraging data from the patients enrolled in the INSPIRE 1.0 Study, the study was halted in mid-2017 due to three patient deaths, which were deemed unrelated to the NSS Implant by the respective site principal investigators. InVivo subsequently worked with the FDA to initiate the INSPIRE 2.0 Study, which included risk mitigation criteria for the challenges it faced in the INSPIRE 1.0 Study. In 2023, InVivo announced that the data from the INSPIRE 2.0 Study had failed to meet the pre-defined success criteria and primary endpoint for the study. In March 2023, InVivo ultimately determined it was in the best interests of the company and its stakeholders to halt further development of the NSS Implant in light of the INSPIRE 2.0 Study's unfavorable results and the anticipated time and resources it would take to conduct another clinical trial.

### *Prepetition Wind-Down Efforts*

20. Following InVivo's strategic decision to suspend development of the NSS Implant program, InVivo engaged in various efforts to wind-down its operations. InVivo undertook these steps to (i) ensure the wind-down of its clinical trials would be performed in accordance with applicable laws and regulations and would respect patient health and safety, (ii) streamline the process for a sale of its assets while also remaining open to other value-maximizing alternative strategies, and (iii) minimize the expense of its wind-down for the benefit of its constituencies. In particular, InVivo entered into favorable settlements with two of its most significant contract counterparties: its CRO, IQVIA Biotech LLC ("IQVIA"); and its former landlord, ARE-MA REGION NO. 59, LLC ("ARE").

i. *IQVIA*

21. IQVIA is the CRO engaged by InVivo to manage and execute clinical studies of the NSS Implant on a contract basis (each such contract, a "CRO Contract"). At the time of InVivo's strategic decision to suspend development of the NSS Implant, InVivo and IQVIA had one outstanding CRO Contract for each of the INSPIRE 1.0 Study and the INSPIRE 2.0 Study. The contract for the INSPIRE 1.0 Study was first dated June 11, 2019, and most recently amended on November 9, 2023 (as amended, the "INSPIRE 1.0 Contract"). Under the INSPIRE 1.0 Contract, IQVIA agreed to perform a clinical study of the NSS Implant with services ending April 26, 2024, and the Company agreed to pay certain corresponding fees. The contract for the INSPIRE 2.0 Study was first dated August 24, 2018, and most recently amended on November 9, 2023 (as amended, the "INSPIRE 2.0 Contract"). Under the INSPIRE 2.0 Contract, IQVIA agreed to perform a clinical study of the NSS Implant with services ending May 10, 2024, and the Company agreed to pay certain corresponding fees. In light of the Company's decision to suspend development of the NSS Implant, the majority of IQVIA's services were no longer needed for the duration of the INSPIRE 1.0 Contract and the INSPIRE 2.0 Contract, but IQVIA's services were needed to wind-down both clinical trials properly in accordance with applicable laws and regulations and to respect patient health and safety, including with respect to the IDE amendment for both trials approved by the FDA in August 2023.

22. To obtain the services needed from IQVIA in the wind-down of InVivo's clinical trials, and to resolve IQVIA's potential claims under the INSPIRE 1.0 Contract and the INSPIRE 2.0 Contract in a manner that would maximize the value of the Debtors' estates in these Chapter 11 Cases, the Company entered into a settlement agreement with IQVIA on November 9, 2023 (the "IQVIA Settlement"). Under the material terms of the IQVIA Settlement, InVivo agreed to

allow IQVIA to retain a prepayment of $130,681.41 held by IQVIA under the INSPIRE 1.0 Contract and a prepayment of $252,551.62 held by IQVIA under the INSPIRE 2.0 Contract, totaling a combined prepayment for both studies of $383,233.03 as of the date of the IQVIA Settlement, and InVivo paid IQVIA an additional $673,800.61 for its future work in winding-down the InVivo clinical trials.  In exchange, IQVIA agreed to perform that clinical trial wind-down work, to terminate the remainder of the INSPIRE 1.0 Contract and the remainder of the INSPIRE 2.0 Contract, and to waive any further claims for payment in connection with the wind-down of the InVivo clinical trials.  As a result, apart from any contingent claims for indemnity that might arise (which InVivo does not anticipate), InVivo was able to cap the costs of the proper wind-down of its clinical studies, protecting patient safety and confidentiality and minimizing risk and cost to the estates, and InVivo now considers all obligations to IQVIA to have been satisfied in full.

   ii. <u>ARE</u>

  23. ARE, a subsidiary of Alexandria Real Estate Equities, Inc., is the owner of InVivo's former corporate headquarters located at One Kendall Square, Suite B14402, Cambridge, Massachusetts 02139.[2]  InVivo and ARE entered into a lease agreement for that property dated May 28, 2021, and an amendment to that lease dated November 23, 2021 (as amended, the "<u>ARE Lease</u>").  The ARE Lease was set to expire on December 31, 2024.  In light of InVivo's decision to suspend development of the NSS Implant, it no longer needed the leased property, and in order to maximize the value of the Debtors' estates, InVivo negotiated a consensual termination of the ARE Lease.

---

[2] The Debtors are currently operating out of a small office space located at 1500 District Avenue, Burlington, Massachusetts under a month-to-month lease.

24.     On August 29, 2023, InVivo entered into an agreement with ARE to terminate the ARE Lease and resolve ARE's claims arising therefrom (the "ARE Settlement").  Under the material terms of the ARE Settlement, the parties agreed to a surrender of the property and termination of the agreement as of August 31, 2023.  InVivo agreed to pay ARE a termination payment of $679,111.00 (equivalent to 11.5 months of rent under the ARE Lease), and to grant ARE a claim in these Chapter 11 Cases, subordinated to all other general unsecured claims, in the amount of $54,527.00 (equivalent to ARE's reletting expenses and 0.5 months of rent under the ARE Lease) (the "Subordinated ARE Claim"), the purpose of which was to allow ARE to be made whole on its claims only if all other creditors of InVivo are paid in full.  To assist with the formation of a confirmable chapter 11 plan in these Chapter 11 Cases, ARE agreed to vote the Subordinated ARE Claim in favor of InVivo's chapter 11 plan.

*Strategic Alternatives and Sale and Marketing Process*

25.     Beginning in March of 2023, InVivo began exploring strategic alternatives to maximize value for all stakeholders, including marketing efforts for the NSS Implant and the exploration of a sale of InVivo's whole business as well as other possible in-licensing and program acquisition opportunities that could provide a path forward for the company.  For the NSS Implant, InVivo conducted a broad outreach effort to existing therapeutic companies, universities and advocacy organizations that it was aware of or had relationships within the spinal cord injury space.  Such inquiries were directed to companies or groups who InVivo believed may be interested in potentially purchasing the NSS Implant as a stand-alone development opportunity or in combination with other therapeutics that such companies have in development.  InVivo had similar outreaches and dialogues with firms who were also specialized in ex-US partnering efforts for its NSS Implant that had previously expressed interest in working with InVivo.  InVivo also attended

various partnering conferences to meet with companies of these profiles. Despite various conversations and meetings with representatives from the entities who responded, no entity has expressed interest in acquiring the NSS Implant for continued development or research.

26. Also starting in March 2023, InVivo conducted outreach efforts to several investment banks regarding the potential sale of its business or other strategic opportunities for InVivo, including reverse mergers. All of the banks noted the significant challenges that InVivo could potentially face in the pursuit of a reverse merger or other strategic transaction and the small likelihood of success given a variety of external factors, including the impact of the recent economic downturn in the U.S. and global financial markets. As a result, the banks were unwilling to formally engage with InVivo to search for a strategic partner. Despite the Debtors' diligent search and marketing efforts to date, no credible or realistic opportunities have materialized as a potential alternative to InVivo seeking relief under chapter 11 of the Bankruptcy Code.

27. In order to maximize the outreach to potential purchasers of its assets, on July 12, 2023, InVivo retained SSG Advisors, LLC ("SSG") as investment banker to continue the marketing process previously commenced by InVivo. Pursuant to the terms of its engagement by the Debtors, SSG was tasked with initiating and conducting discussions with prospective purchasers and investors in connection with any sale transaction, and advising the Debtors in any related negotiations. Following its engagement, SSG undertook a robust process of searching for asset purchasers in the summer and fall of 2023, contacting a total of 205 target potential purchasers and executing one non-disclosure agreement with an interested party. Unfortunately, no potential purchasers submitted bids to purchase InVivo's assets at that time.

28. InVivo also explored the possibility of in-licensing or acquiring other technologies that might, together with new financing to support those technologies, provide a path forward for

the company. InVivo performed significant technological and financial diligence with respect to this type of alternative, but the company could not overcome the difficulty of rebuilding and funding a research platform around the concepts evaluated.

29. Notwithstanding the challenges faced by the company to date, InVivo remains hopeful that the terms of a sale of its assets pursuant to section 363 of the Bankruptcy Code (the "Sale"), specifically the "free and clear" protections provided by a bankruptcy sale process, will attract buyers who indicated some prior interest but did not submit bids prior to the Petition Date. SSG remains retained by the Debtors to continue its efforts to find a purchaser for InVivo's assets, with the understanding that in some cases previously interested purchasers will submit bids for assets only after a seller's chapter 11 proceedings have commenced.

30. Therefore, in order to facilitate the Sale, on the Petition Date, InVivo filed the *Motion of Debtors for Entry of Orders: (A)(I) Approving Bid Procedures Relating to the Sale of Substantially All of the Debtors' Assets, (II) Approving Stalking Horse Bid Protections, (III) Scheduling a Hearing to Consider the Sale, (VI) Approving the Form and Manner of Notice of Sale by Auction, (V) Establishing Notice and Contract Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Bid Procedures and Sale Motion"), which, among other things, details InVivo's proposed bidding procedures and sale process (the "Bid Procedures"). Subject to Court approval, the Bid Procedures contemplate

the following key process dates, designed to proceed efficiently in the context of significant pre-bankruptcy marketing efforts:

| | |
|---:|:---|
| Bid Procedures Hearing: | To be determined by the Court |
| Bid Deadline: | March 29, 2024 at 4:00 p.m. (EST) |
| Auction: | April 3, 2024 at 10:00 a.m. (EST) |
| Sale Hearing: | April 5, 2024 at 10:00 a.m. (EST) (subject to the Court's availability) |

31. Subject to approval of and pursuant to the Bid Procedures, SSG will continue to market InVivo's assets with the assistance and based on the knowledge and experience of InVivo's continuing management. InVivo believes, in the exercise of its business judgment, that the proposed Sale and auction structure will foster an open and competitive process and provide the best option to maximize value for all of their stakeholders. Indeed, given that InVivo has no product candidates presently undergoing active clinical trials (the prior clinical trials being in wind-down mode, as discussed above) and therefore no realistic opportunity to obtain additional financing from the public or private markets, the only alternative to the Sale would be conversion to Chapter 7 and liquidation. In the Debtors' view, a Chapter 7 liquidation would be exceedingly value destructive and wasteful, as the Debtors would immediately lose substantial value as they attempt to monetize their unique assets and distribute value to stakeholders. Specifically, in a Chapter 7 liquidation, InVivo would likely lose the support of its remaining employees—the only people with the requisite knowledge to market and sell the NSS Implant program—in the sale process, and, as a result, any material potential sale proceeds would be substantially diminished or would disappear.

## IV.   PROPOSED COURSE FOR THESE CHAPTER 11 CASES

32. The Debtors intend to pursue the Sale in chapter 11 in order to obtain maximum value for the benefit of all of their stakeholders. The Debtors have access to unencumbered cash

that will, based on their budget, provide them with sufficient liquidity to satisfy all administrative claims accruing during the Sale process and Chapter 11 Cases in full, and to wind-down the Debtors' estates after the completion of the Sale process.

33. As of the Petition Date, there is a reasonable prospect that InVivo will be able to satisfy all claims in these Chapter 11 Cases in full; however, it appears unlikely that any meaningful excess value over the amount of such claims will be available for distribution to equityholders. In order to achieve their goals in chapter 11, the Debtors seek the relief set forth in the First Day Motions, defined and as summarized below.

## V.  FACTS IN SUPPORT OF FIRST DAY PLEADINGS[3]

34. To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient wind-down that will preserve and maximize the value of the Debtors' estates, the Debtors have filed the following motions (the "First Day Motions"):

- *Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases;*

- *Debtors' Application for Authorization to Retain and Employ Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Tax and Fee Obligations and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers;*

- *Motion of the Debtors for Entry of an Order Modifying the Requirements for the List of Equity Security Holders and Modifying the Notice Requirements for Equity Security Holders;*

- *Motion of the Debtors for Entry of an Order (a) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks,*

---

[3] Capitalized terms not defined within this Section V shall have the meaning ascribed to such terms in the respective First Day Motions.

*(b) Authorizing the Continued Use of Existing Cash Management System, and (c) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b); and*

- *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Associated Obligations.*

35. I have reviewed each of the First Day Motions, including any exhibits thereto, and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I hereby incorporate by reference each of the factual statements set forth in the First Day Motions. These First Day Motions seek authority to, among other things, honor employee-related wages and benefit obligations, tax obligations and to ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to prevent irreparable harm and to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

36. Certain of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their request for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

37. In sum, I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful Sale and wind-

down; (c) is necessary to avoid immediate and irreparable harm; and (d) best serves the interests of the Debtors' stakeholders.

## DECLARATION

38. Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 1, 2024
       Burlington, MA

**InVivo Therapeutics Holdings Corp.**

*/s/ Richard Christopher*
Richard Christopher
Chief Financial Officer