## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INVIVO THERAPEUTICS CORPORATION, *et al.*,[1] | Case No. 24-10137 (MFW) |
| | (Joint Administration Pending) |
| Debtors. | **Hearing Date:  February 27, 2024 at 2:00 p.m. (ET)** |
| | **Objection Deadline:  February 15, 2024 at 4:00 p.m. (ET)** |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) APPROVING STALKING HORSE BID PROTECTIONS, (III) SCHEDULING A HEARING TO CONSIDER THE SALE, (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF</u>**

The above-captioned debtors and debtors-in-possession (together, the "<u>Debtors</u>"), by and through their proposed undersigned counsel, hereby file this motion (the "<u>Motion</u>") pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (as amended or modified, the "<u>Bankruptcy Code</u>"); rules 2002, 6003, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"); and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), for entry of two orders: (a) the first order, substantially in the form attached hereto as **Exhibit A** (the "<u>Bid Procedures Order</u>") (i) approving the procedures (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: InVivo Therapeutics Corporation (6670) and InVivo Therapeutics Holdings Corp. (8166).  The Debtors' mailing address is 1500 District Avenue, Burlington, MA 01803.

"Bid Procedures")[2] in connection with the solicitation and acceptance of bids with respect to the proposed sale (the "Sale") of substantially all of the Debtors' remaining assets (in other words, all assets of the Debtors relating to the Debtors' NSS Implant (as defined herein) development program) (the "Assets" and each Sale of Assets, a "Sale Transaction"); (ii) approving Stalking Horse Bid Protections (as defined below); (iii) scheduling a hearing for approval of the Sale (the "Sale Hearing") and setting objection deadlines with respect to the Sale; (iv) approving the form and manner of notice (the "Sale Notice")[3] of the Sale and related auction (the "Auction") for the Assets; (v) establishing procedures to determine cure amounts and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases; and (vi) granting related relief; and (b) the second order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order")[4] (i) authorizing the Sale free and clear of Encumbrances[5] with such Encumbrances to attach to the Sale Proceeds (if any); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The U.S. Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)

---

[2] A copy of the proposed Bid Procedures is attached as Exhibit 1 to the Bid Procedures Order.
[3] A copy of the proposed notice of Auction is attached as Exhibit 2 to the Bid Procedures Order.
[4] Exhibit B will be filed with the Court prior to the objection deadline for the Sale Hearing.
[5] Capitalized terms used but not defined herein shall have the same meanings given to such terms as in the Bid Procedures, and/or the First Day Declaration (defined below), as applicable.

and the Court may enter a final order consistent with Article III of the United States Constitution.[6] Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The predicates for the relief sought herein are Bankruptcy Code sections 105(a), 363, 365, 503, and 507, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, and 9008, and Local Rule 6004-1.

## BACKGROUND

### A.  General

3.      On the date hereof (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

4.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  As of the date of this Motion, no trustee, examiner or statutory committee (a "Committee") has been appointed in these Chapter 11 Cases.

5.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' business and capital structure is set forth in the *Declaration of Richard Christopher in Support of the Debtors' Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

---

[6] Pursuant to Local Rule 9013-1(f) the Debtors hereby confirm their consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### i.    *Business Operations*

6.      The Debtors are, collectively, a research and clinical-stage biomaterials and biotechnology company with a focus on treatment of spinal cord injuries ("SCI"), with the goal of developing treatment options intended to provide meaningful improvement in patient outcomes following SCI.  As described in the First Day Declaration, the Debtors' only remaining potentially monetizable assets relate to their investigational Neuro-Spinal Scaffold implant (the "NSS Implant"), which, until recently, had been the subject of active clinical trials that produced promising results.

7.      Prior to the Petition Date, InVivo pursued development of its investigational Neuro-Spinal Scaffold implant (the "NSS Implant"), a bioresorbable polymer scaffold that is designed for implantation at the site of injury within a spinal cord and is intended to treat acute SCI.  The NSS Implant is intended to promote side-by-side healing by supporting the surrounding tissue after injury, minimizing expansion of areas of necrosis, and providing a biomaterial substrate for the body's own healing and repair processes.

8.      The NSS Implant incorporates intellectual property licensed under an exclusive, worldwide license from Boston Children's Hospital ("BCH") and the Massachusetts Institute of Technology ("MIT"), the term of which expires in 2027 or the life of the last patent expiration, whichever is later, unless terminated earlier by BCH (the "BCH License").  In connection with InVivo's acquisition of the BCH License, InVivo agreed to a development plan that includes certain targets and projections related to the timing of product development and regulatory approvals, as well as InVivo's payment of certain milestone payments, royalties and other fees.

9.      Despite significant investment and promising results in initial clinical trials, InVivo is unable to continue clinical development of the NSS Implant due to setbacks in subsequent clinical trials and financial constraints.  In particular, in March of 2023, InVivo announced that

data from its most recent and only active clinical trial had failed to meet the pre-defined success criteria and primary endpoint for the study.  Having no other program assets besides the NSS Implant that could support continued operations or attract new financing opportunities prior to the Petition Date, InVivo terminated the development of the NSS Implant and pivoted to a wind-down and asset monetization strategy in order to maximize the value of its enterprise for its constituents. Development of the NSS Implant could be reinitiated by a buyer, moving forward the positive developmental momentum generated by the Debtors to date.

### B.  Events Leading to the Chapter 11 Cases

### i.  NSS Implant Setbacks and Decision to Suspend Development

10.     In 2014, the Debtors initiated a first clinical study of the NSS Implant in patients with acute spinal cord injury ("INSPIRE 1.0 Study"), which was designed to enroll 20 patients. Despite encouraging data from the first 19 patients enrolled into the INSPIRE 1.0 Study, the study was halted in mid-2017 due to three patient deaths, which were deemed unrelated to the NSS Implant by the Principal Investigators of the applicable clinical sites.  The Debtors subsequently worked with the FDA to initiate a second study ("INSPIRE 2.0 Study"), which included risk mitigation criteria for the challenges it faced in the INSPIRE 1.0 Study.  In 2023, the Debtors announced that the data from the INSPIRE 2.0 Study had failed to meet the pre-defined success criteria and primary endpoint for the study.  In March 2023, InVivo ultimately determined it was in the best interests of the company and its stakeholders to halt further development of the NSS Implant in light of the INSPIRE 2.0 Study's unfavorable results and the anticipated time and resources it would take to conduct another clinical trial.

### ii.  Sale & Marketing Process

11.     Beginning in March of 2023, InVivo began exploring strategic alternatives to maximize value for all stakeholders, including marketing efforts for the NSS Implant and the

exploration of a sale of InVivo's whole business.  For the NSS Implant, InVivo conducted a broad outreach effort to existing therapeutic companies, universities and advocacy organizations that it was aware of or had relationships within the spinal cord injury space.  Such inquiries were directed to companies or groups who InVivo believed may be interested in potentially purchasing the NSS Implant as a stand-alone development opportunity or in combination with other therapeutics that such companies have in development.  InVivo had similar outreaches and dialogues with firms who were also specialized in ex-U.S. partnering efforts for its NSS Implant that had previously expressed interest in working with InVivo.  InVivo also attended various partnering conferences to meet with companies of these profiles.  Despite various conversations and meetings with representatives from the entities who responded, no entity has expressed interest in acquiring the NSS Implant for continued development or research.

12.     Also starting in March 2023, InVivo conducted outreach efforts to several investment banks regarding the potential sale of its business or other strategic opportunities for InVivo, including reverse mergers.  All of the banks noted the significant challenges that InVivo could potentially face in the pursuit of a reverse merger or other strategic transaction and the small likelihood of success given a variety of external factors, including the impact of the recent economic downturn in the U.S. and global financial markets.  As a result, the banks were unwilling to formally engage with InVivo to search for a strategic partner.  Despite the Debtors' diligent search and marketing efforts to date, no credible or realistic opportunities have materialized as a potential alternative to InVivo seeking relief under chapter 11 of the Bankruptcy Code.

13.     In order to maximize the outreach to potential purchasers of its assets, on July 12, 2023, InVivo retained SSG Advisors, LLC ("SSG") to continue the marketing process previously commenced by InVivo.  SSG undertook a robust process of searching for asset purchasers in the

summer and fall of 2023, contacting a total of 205 target potential purchasers and executing one non-disclosure agreement with an interested party. Unfortunately, no potential purchasers submitted bids to purchase InVivo's assets at that time.

14. Notwithstanding the challenges faced by the company to date, InVivo remains hopeful that the terms of the Sale, specifically the "free and clear" protections provided by a bankruptcy sale process, will attract buyers who indicated some prior interest but did not submit bids prior to the Petition Date. SSG remains retained by the Debtors to continue its efforts to find a purchaser for InVivo's assets, with the understanding that in some cases previously interested purchasers will submit bids for assets only after a seller's chapter 11 proceedings have commenced.

15. Subject to approval of and pursuant to the Bid Procedures, SSG will continue its efforts in marketing the NSS Implant assets with the assistance, knowledge, and experience of the Debtors' continuing management. The Debtors believe, in the exercise of their business judgment, that the proposed Sale and auction structure will foster an open and competitive process and provide the best option to maximize value for all of their stakeholders. Indeed, given that the Debtors have no product candidates presently undergoing clinical trials and therefore no realistic opportunity to obtain additional financing from the public or private markets, the only alternative to the Sale would be conversion to Chapter 7 and liquidation. In the Debtors' view, a Chapter 7 liquidation would be exceedingly value destructive and wasteful, as the Debtors would immediately lose substantial value as they attempt to monetize their unique assets and distribute value to stakeholders. Specifically, in a Chapter 7 liquidation, the Debtors would likely lose the support of their remaining employees—the only people with the requisite knowledge to market and sell the NSS Implant program—in the sale process, and, as a result, any material potential sale

proceeds would be substantially diminished or would disappear.  Thus, and in sum, the only potential value to be derived from the NSS Implant program is through a sale of that program to a party that could, with the assistance of the Debtors' remaining management and advisors, reinitiate the program and conduct further program studies on more cost-efficient and well-funded platforms.

### C. Proposed Bid Procedures

16.     While the pre-bankruptcy efforts of the Debtors and SSG to date have not yet identified any preferred buyer for the NSS Implant program, the Debtors believe, based on the attributes of the NSS Implant program assets and the nature of the market for those assets, that buyers may come forward through a bankruptcy auction process as described here. The Debtors seek to conduct an open and transparent sale process pursuant to which the Successful Bidder (defined below) will enter into an asset purchase agreement for the purchase of a portion of or substantially all of the Debtors' assets (which is essentially equivalent at this stage to the assets related to the NSS Implant program) free and clear of all Encumbrances, with such Encumbrances attaching to the proceeds of the Sale.

17.     The Bid Procedures, as summarized below, were developed consistent with the Debtors' need to proceed with an expeditious sale process to minimize administrative costs, maximize the value of the Debtors' assets, and promote active bidding that will result in the highest or otherwise best offer for such assets.  Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, fair and open fashion that promotes interest in the Debtors' assets by financially-capable, motivated bidders who are likely to close the Sale on the timetable necessitated in these Chapter 11 Cases.

18.     The following paragraphs in this section summarize key provisions of the bid procedures, and are qualified in their entirety by reference to the actual Bid Procedures:

    a.   <u>Access to Due Diligence Materials</u>.  The Debtors have posted copies of all material documents related to the Debtors' assets to the Debtors' confidential electronic data room (the "<u>Data Room</u>").[7]  To access the Data Room, a party must submit to the Debtors' advisors:

        i.   an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern); and

        ii.   sufficient information, as reasonably requested by the Debtors, to allow the Debtors to determine that the interested party (i) has the financial wherewithal to consummate a Sale Transaction, and (ii) intends to access the Data Room for a purpose consistent with these Bid Procedures.

    b.   <u>Qualified Bidder</u>.  A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name and any other party that will be participating in connection with the bid, and includes the material terms of the offer to purchase a portion of or substantially all of the Debtors' assets (a "<u>Bid</u>").  To constitute a "Qualified Bid" a Bid must include, at a minimum, the following:

        i.   <u>Acquired Assets</u>.  Each Bid must clearly identify, in writing and as applicable, the particular assets the Potential Bidder seeks to acquire from the Debtors, including any contracts and leases of the Debtors that would be assumed and assigned in connection with a proposed Sale Transaction.[8]  For the avoidance of doubt, a Qualified Bid may include a Bid for less than all or substantially all of the Debtors' assets.

        ii.   <u>Purchase Price; Form of Consideration; Cash Requirements; Assumed Liabilities</u>.  Each Bid must clearly set forth, as applicable:

           (A)   <u>Purchase Price</u>.  Each Bid must clearly identify the purchase price to be paid (the "<u>Purchase Price</u>"), and whether the Bid

---

[7] Notably, the Debtors have made key data regarding the performance and safety of the NSS Implant public prior to the Petition Date. That, in addition to the extensive outreach to potential buyers already made by the Debtors and SSG prior to the Petition Date, means that many interested parties have already been given access to information regarding the NSS Implant program prior to the filing of this Motion. This fact will streamline the Debtors' sale process from here forward and maximize the value of the NSS Implant program in the auction environment.

[8] Specifically, each Bid should indicate its preferred method of addressing the BHC and MIT in-licenses, whether assumption and assignment, renegotiation with the licensors, or other method.

is based on an all-cash offer or consists of certain non-cash components, including, without limitation, and/or the assumption of liabilities;

(B) Cash Requirements. Each Bid must provide sufficient cash consideration for the payment of any applicable Termination Payment in cash in full; and

(C) Assumed Liabilities. Each Bid must clearly identify, in writing and as applicable, the particular liabilities, if any, including executory contracts, the Bidder seeks to assume. For the avoidance of doubt, a Qualified Bid may include a bid for less than all or substantially all of the Debtors' liabilities.

iii. Proposed APA. Each Bid must include an executed asset purchase agreement (the "Proposed APA") for the assets included in such Bid, together with a redline comparing the Proposed APA to the form APA attached to the Bid Procedures as Exhibit A.

iv. Unconditional Offer. A statement that the Bid is formal, binding, and unconditional, is not subject to any further due diligence or financing contingency, and is irrevocable until the Debtors notify the Potential Bidder that such Bid is not a Successful Bid or a Back-Up Bid, or until the first business day after the close of a Sale Transaction.

v. Proof of Financial Ability to Perform. Each Bid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a Sale Transaction including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments if needed to consummate the transaction (not subject to, in the Debtors' discretion, any unreasonable conditions), contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors necessary to demonstrate that such Potential Bidder has the ability to consummate a Sale Transaction in a timely manner.

vi. Designation of Contracts and Leases. Each Bid must identify, with particularity, each and every executory contract and unexpired lease, the

assumption and assignment of which is a condition to closing a Sale Transaction;[9] ***provided, however,*** that the Bid may allow for the Potential Bidder to remove executory contracts and unexpired leases from the list of contracts to be assumed and assigned any time prior to the closing of a Sale Transaction; ***provided, further, however,*** that to the extent the Debtors identify any additional executory contracts or unexpired leases after the Bid is submitted, the Bid may allow for the Potential Bidder to add such executory contracts and unexpired leases to the list of contracts to be assumed and assigned any time from and after the Bid is submitted.

vii.   <u>Required Approvals</u>.  A statement or evidence (1) of the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals; and (2) that the Bid is reasonably likely to be consummated, if selected as the Successful Bid, within a time frame required by the Bid Procedures Order and otherwise acceptable to the Debtors.

viii.   <u>Authorization</u>.   Each Bid must include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed APA in accordance with the terms of the Bid and these Bid Procedures.

ix.   <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  With the exception of any Stalking Horse Bid, expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

x.   <u>Joint Bids</u>.  The Debtors may approve joint Bids in their reasonable discretion on a case-by-case basis.

xi.   <u>Representations and Warranties</u>.  Each Bid must include the following representations and warranties:

(A)   a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable assets prior to submitting its Bid;

(B)   a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection

---

[9] See FN 8 above.

of any relevant documents and the assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed APA ultimately accepted and executed by the Debtors;

(C)    a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next or highest or next best bid after the Successful Bid with respect to the applicable assets;

(D)    a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid; and

(E)    a statement that the Potential Bidder agrees to be bound by the terms of the Bid Procedures.

xii.    A Potential Bidder must also accompany its Bid with:

(A)    a cash deposit in the amount of ten percent (10%) of the Purchase Price (a "Good Faith Deposit");

(B)    the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wishes to discuss the Bid submitted by the Potential Bidder;

(C)    a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable regulatory requirements; and

(D)    if the value of a Bid includes additional non-cash components, a detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value.

c.    Good Faith Deposit. A Good Faith Deposit must be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors or with the Debtors' counsel, as agreed by the Debtors (the "Escrow Agent") pursuant to an escrow agreement or other documentation to be provided by the Debtors. To the extent a Qualified Bid is modified before, during, or after the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its Good Faith Deposit so that it equals ten percent (10%) of the Purchase Price. If a Qualified

Bidder is required to adjust its Good Faith Deposit, its status as a Qualified Bidder shall be suspended pending satisfaction of such adjustment.

d. <u>Bid Deadline</u>.  The Bid Deadline for a Potential Bidder to submit a Bid shall be March 29, 2024 at 4:00 p.m. (EST).  No Bid received after the Bid Deadline shall be considered a Qualified Bid.

   i. The Debtors, in consultation with the Committee, if any, will evaluate Bids that are timely submitted and may engage in negotiations with Potential Bidders who submitted Bids as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid.

   ii. A Bid received for assets that is determined by the Debtors (in consultation with the Committee, if any) to meet the requirements set forth herein will be considered a "Qualified Bid" and any bidder that submits a Qualified Bid (including any Stalking Horse Bid) will be considered a "Qualified Bidder."

   iii. By no later than April 1, 2024 (the "<u>Qualified Bid Deadline</u>"), the Debtors shall determine, in their reasonable judgment (after consultation with the Committee, if any) which of the Bids received by the Bid Deadline qualifies as a Qualified Bid.  The Debtors shall notify each Bidder who submits a Qualified Bid of its status as a Qualified Bidder by the Qualified Bid Deadline.

e. <u>Auction</u>.  If the Debtors receive two or more Qualified Bids for substantially the same assets, the Debtors may, in their business judgment, conduct the Auction in person or by remote audio and video link on April 3, 2024, beginning at 10:00 a.m. (ET) at the offices of Landis Rath & Cobb LLP, 919 N. Market Street, Wilmington, DE 19801.  Only a Qualified Bidder will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith.  In addition, professionals and/or other representatives of the Debtors and the Committee (if any) shall be permitted to attend and observe the Auction along with any other party in interest so permitted by the Debtors or the Court upon request.  Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

   i. The Debtors, in consultation with the Committee, if any, may adopt rules for the Auction at any time that the Debtors reasonably determine to be appropriate to promote a value-maximizing auction.  Any rules developed by the Debtors will provide that all bids in the Auction will be made and received on an open basis, and all other bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder placing a bid at the Auction will be fully disclosed to all other bidders participating

in the Auction and that all material terms of a bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders. Each Qualified Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded.

ii. The Debtors may, in their discretion and in consultation with the Committee, if any, identify the highest or otherwise best Qualified Bid as the successful bid (a "Successful Bid" and the bidder submitting such bid, a "Successful Bidder"). The Debtors may also identify a Qualified Bidder that submitted the next highest or otherwise best Qualified Bid as a back-up bid (a "Back-Up Bid" and the bidder submitting such bid, a "Back-Up Bidder"). A Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) consummation of a Sale Transaction with the Successful Bidder and (ii) the release of such Back-Up Bid by the Debtors in writing (such date, the "Back-Up Bid Expiration Date"). If a Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid, ***provided however,*** that the Debtors are not required to accept any Bid or designate a Successful Bidder or Back-Up Bidder.

iii. Within one (1) business day after the Auction, a Successful Bidder shall submit to the Debtors fully executed documentation memorializing the terms of a Successful Bid. A Successful Bid may not be assigned to any party without the consent of the Debtors.

iv. At any time before entry of an order approving an applicable Sale Transaction envisioned by a Qualified Bid the Debtors reserve the right to and may reject such Qualified Bid if such Qualified Bid, in the Debtors' judgment (after consultation with the any Committee), is: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bid Procedures, or the terms and conditions of the applicable Sale Transaction; or (iii) contrary to the best interests of the Debtors and their estates.

f. Post-Auction Process. Within one (1) business day after the conclusion of the Auction, or as soon as reasonably practicable thereafter, the Debtors shall file with the Court a notice of a Successful Bid, Successful Bidder, Back-Up Bid, and Back-Up Bidder. Unless otherwise required pursuant to the Debtors' fiduciary duties, the Debtors shall not consider any bids submitted after the conclusion of the Auction.

i. Within seven (7) days after the Auction, the Debtors shall direct the Escrow Agent to return the deposit of any bidder, who is not declared a

Successful Bidder or Back-Up Bidder. Within five (5) days after the Back-Up Bid Expiration Date, the Debtors shall direct the Escrow Agent to return the deposit of a Back-Up Bidder. Upon the authorized return of any such deposit, the bid of such Potential Bidder, Qualified Bidder or Back-Up Bidder, as applicable, shall be deemed revoked and no longer enforceable.

ii.   A Successful Bidder's deposit shall be applied against the cash portion of the purchase price of such bidder's Successful Bid upon the consummation of a Sale Transaction. In addition to the foregoing, the deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein, during the time the Qualified Bid remains binding and irrevocable or (ii) the Qualified Bidder is selected as a Successful Bidder or Back-Up Bidder and refuses or fails to enter into the required definitive documentation or to consummate a Sale Transaction according to the Bid Procedures.

g.   <u>Sale Hearing</u>. If the Debtors elect to proceed with a Sale Transaction, the Debtors will seek the entry of an order authorizing and approving the Sale Transaction at a hearing before the Court on April 5, 2024 (or other such date as the Court may determine) (the "<u>Sale Hearing</u>"). The Debtors, in the exercise of their business judgment, may adjourn the Sale Hearing without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at the Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Court prior to the commencement of the Sale Hearing.

i.   Objections to a Sale Transaction, including any objection to the sale of the Debtors' assets free and clear of liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code (each, a "<u>Sale Objection</u>"), shall (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; (v) be filed with the Court; and (vi) be served upon the Notice Parties (as defined in the in the Bid Procedures Order) by March 29, 2024 at 4:00 p.m. (ET) (the "<u>Sale Objection Deadline</u>"); provided that, the Debtors may extend the Sale Objection Deadline, as the Debtors deem appropriate in the exercise of their reasonable business judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard by the Court at the Sale Hearing.

h.   <u>Consent to Jurisdiction</u>. All bidders that participate in the bidding process shall be deemed to have: (i) consented to the core jurisdiction of the Court to enter

any order or orders, which shall be binding in all respects, in any way related to these Bid Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to an applicable Sale Transaction; (ii) waived any right to a jury trial in connection with any disputes relating to these Bid Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale Transaction; and (iii) consented to the entry of a final order or judgment in any way related to these Bid Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to an applicable Sale Transaction if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

19.     Pursuant to Local Rule 6004-1: (i) each bidder participating at the Auction will be required to make a non-collusion representation (a "Non-Collusion Representation"); (ii) the Auction will be conducted openly and may be attended by the Debtors' professionals, the Committee, if any, and its professionals and the Auction participants; (iii) the only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder; and (iv) the Auction will be transcribed.

20.     Other than as expressly set forth in the Bid Procedures, the Debtors reserve the right to:  (a) impose additional terms and conditions with respect to any or all Potential Bidders; (b) extend the deadlines set forth herein or the date for the Auction; (c) cancel or extend the sale of the Assets and/or Sale Hearing in open court; and/or (d) amend the Bid Procedures, in each case, so long as the exercise of any such right is consistent with the Debtors' fiduciary duties and the best interests of the Debtors' estate.

## D.  Designation of Stalking Horse Bidders

21.     As set forth in the Bid Procedures, the Debtors request authority to (a) designate one or more Stalking Horse Bidders for one or more of the Debtors' assets; (b) enter into Stalking Horse Agreements with the Stalking Horse Bidders; and (c) provide the Stalking Horse Bidders will Stalking Horse Bid Protections (as defined below), where the Debtors determine, in the

exercise of their reasonable business judgment, that setting a floor price for the Assets is in the best interest of the Debtors' estate.

22.     Having flexibility to designate Stalking Horse Bidders for certain or substantially all of the Debtors' assets will enhance the Debtors' ability of maximize value of the Assets and, accordingly, is in the best interest of the Debtors' estate.

23.     Specifically, the Debtors may: (a) establish initial overbid minimum and subsequent bidding increment requirements; (b) offer each Stalking Horse Bidder a break-up fee and/or expense reimbursement in an amount agreed to by the Debtors and consistent with market practices (a "Termination Payment"); (c) provide that, if the Stalking Horse Bidder bids on certain assets at the Auction, the Stalking Horse Bidder will be entitled to a credit in the amount of its Termination Payment against the increased purchase price for the assets; and (d) provide other appropriate and customary protections to a Stalking Horse Bidder (the Termination Payment and the other bid protection described in this paragraph collectively are referred to as the "Stalking Horse Bid Protections").

24.     To the extent the Debtors designate a Stalking Horse Bidder with respect to any of the assets, the Debtors shall promptly upon execution of a Stalking Horse Agreement (and in no event more than one (1) calendar day following such execution) file with the Court and cause to be published on the website maintained by the Debtors' claims and noticing agent in this Chapter 11 Case, located at Debtors' claims agent's website at https:// www.kccllc.net/invivo, a notice that contains information about the Stalking Horse Bidder, the Stalking Horse Bid, and attaches the proposed Stalking Horse Agreement (the "Notice of Stalking Horse Bidder").

25.     Any objections (each, a "Stalking Horse Objection") to the designation of a Stalking Horse Bidder, including any Stalking Horse Bid Protections pursuant to the terms and

provisions of a Stalking Horse Agreement, must: (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (c) state with particularity the basis and nature of any objection; (d) conform to the Bankruptcy Rules and the Local Rules; and (e) be served upon the Sale Notice Parties (as defined herein) within five (5) calendar days after the filing of the relevant Notice of Stalking Horse Bidder.  If a timely Stalking Horse Objection is filed and served in accordance with the preceding paragraph, the proposed Stalking Horse Bid Protections will not be deemed approved until either the Stalking Horse Objection is resolved by agreement of the objecting party and the Debtors or by order of the Court. If no timely Stalking Horse Objection is filed and served with respect to an applicable Stalking Horse Agreement in accordance with the Bid Procedures, the Stalking Horse Bid Protections shall be deemed approved without further order of the Court upon the expiration of the objection deadline.

26.     Given the Debtors' need to maximize value for creditors through a timely and efficient marketing and sale process, the ability to designate Stalking Horse Bidders and offer such bidders Stalking Horse Bid Protections is justified, appropriate and essential.

27.     For reference, the material terms of the Proposed APA required to be highlighted pursuant to Local Rule 6004-1 are as follows:[10]

| Sale to Insider<br><br>Local Rule 6004-l(b)(iv)(A) | Not applicable. |
|---|---|

---

[10] The following summary and terms defined herein are qualified in their entirety by reference to provisions of the Proposed APA. In the event of any inconsistencies between the provisions of the Proposed APA and the terms herein, the terms of the Proposed APA shall govern. Capitalized terms used in this section of this Motion and not otherwise defined shall have the meanings ascribed thereto in the Proposed APA.

| | |
|---|---|
| **Agreements with Management**<br><br>**Local Rule 6004-l(b)(iv)(B)** | Not applicable. |
| **Releases**<br><br>**Local Rule 6004-l(b)(iv)(C)**<br><br>**(APA, Section 9.2)** | The Proposed APA contemplates that effective as of and conditioned upon the occurrence of Closing, Purchaser will release and forever discharge the Debtors and the Debtors' directors, officers, employees, agents, representatives, successors, assigns, and holders of Claims or interests in the Debtors' chapter 11 bankruptcy estate, from any and all actions, suits, debts, liens, sums of money, accounts, judgments, claims and demands whatsoever, at law or in equity, either in contract or in tort, whether known or unknown, on account of, arising out of or relating to (a) any act or omission of any kind or character whatsoever that relates to the Debtors or the Agreement and the proposed transactions contemplated therein occurring at or prior to the Closing, or (b) the Acquired Claims; provided that nothing in the release clause of the Agreement shall release or discharge any Claim of Purchaser under the Agreement. Purchaser agrees that, in addition to the Debtors, any other person or entity released and discharged under the release clause of the Agreement is a third-party beneficiary of the release clause of the Agreement and shall be entitled to rely on and enforce it accordingly. |
| **Competitive Bidding/Auction**<br><br>**Local Rule 6004-l(b)(iv)(D)**<br><br>*(See* **Bid Procedures)** | The Bid Procedures contemplate an open bidding and sale process, not a private sale, which will include an auction if the Debtors receive multiple Qualified Bids. |
| **Closing and Other Deadlines**<br><br>**Local Rule 6004-l(b)(iv)(E)** | To be determined. |

| | |
|---|---|
| **Good Faith Deposit**<br><br>**Local Rule 6004-l(b)(iv)(F)**<br><br>*(See* **Bid Procedures and APA, Section 3.4)** | With its Bid, a Potential Bidder must deposit a cash deposit in the amount of ten percent (10%) of the Purchase Price (a "Good Faith Deposit").<br><br>The deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted in the Bid Procedures, during the time the Qualified Bid remains binding and irrevocable or (ii) the Qualified Bidder is selected as a Successful Bidder or Back-Up Bidder and refuses or fails to enter into the required definitive documentation or to consummate a Sale Transaction according to the Bid Procedures and the Proposed APA.<br><br>The Proposed APA contemplates that once a Qualified Bidder is identified as a Successful Bidder, if the Successful Bidder fails to complete the Closing, then the Good Faith Deposit shall be disbursed as follows: (i) in the event of a termination of the Agreement by the Debtors if the Successful Bidder fails to satisfy any of its material obligations at Closing, the Debtors shall be entitled to retain the Good Faith Deposit as liquidated damages; (ii) in the event of a termination of this Agreement for any reason other than by the Debtors pursuant to the Successful Bidder failing to satisfy any of its material obligations at Closing, the Deposit shall be returned to Successful Bidder; or (iii) in the event of a termination of this Agreement and the Deposit has not been disbursed in accordance with clauses (i) or (ii), above, then the Good Faith Deposit shall be disbursed as any court of competent jurisdiction may direct. |
| **Interim Arrangements with Proposed Buyer**<br><br>**Local Rule 6004-l(b)(iv)(G)** | Not applicable. |
| **Proceeds Allocation Local Rule 6004-**<br><br>**l(b)(iv)(H)**<br><br>**(APA, Section 2.7)** | The Proposed APA contemplates that any liens on the Acquired Assets existing as of the Closing Date will attach to the proceeds from the sale of the Acquired Assets according to such liens' relative priorities. |

| | |
|---|---|
| **Tax Exemption**<br><br>**Local Rule 6004-1(b)(iv)(I)** | Not applicable. |
| **Record Retention**<br><br>**Local Rule 6004-l(b)(iv)(J)**<br><br>**(APA, Exhibit D)** | The Proposed APA contemplates that the Debtors shall retain all corporate seals, minute books, charter documents, corporate stock record books, original tax and financial records and such other files, books and records of the Debtors that the Debtors are required by Law to retain or that exclusively relate to the Excluded Assets and Excluded Liabilities; provided, however, that the Debtors shall provide Purchaser with reasonable access to and copies of any such materials. |
| **Sale of Avoidance Actions**<br><br>**Local Rule 6004-l(b)(iv)(K)**<br><br>**(APA, Section 1.1)** | The Proposed APA contemplates that pursuant to the Sale, the Debtors intend to sell any and all Avoidance Actions against any vendor, customer, or other counterparty of the Business. |
| **Successor Liability**<br><br>**Local Rule 6004-l(b)(iv)(L)**<br><br>**(APA, Sections 2.1, 2.3)** | The Proposed APA contemplates that the Debtors are seeking to sell the Acquired Assets free and clear of all Encumbrances, including successor liability claims, with the exception of any Encumbrances included among the Assumed Liabilities. |
| **Sale Free and Clear of Unexpired Leases**<br><br>**Local Rule 6004-l(b)(iv)(M)** | Not Applicable. |
| **Credit Bid**<br><br>**Local Rule 6004-l(b)(iv)(N)**<br><br>*(See* **Bid Procedures)** | Not Applicable. |

| | |
|---|---|
| **Relief from B.R. 6004(h)**<br><br>**Local Rule 6004-l(b)(iv)(O)** | The Debtors seek relief pursuant to Bankruptcy Rule 6004(h). |

### E.  <u>Notice of Auction and Sale</u>

28.      The Debtors seek to have the Auction scheduled to commence in person or by telephonic and/or video conference at 10:00 a.m. (ET) on April 3, 2024 at the offices of Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801.  Within two (2) days of the entry of the Bid Procedures Order, the Debtors will serve by first class mail, postage prepaid, copies of: (a) the Bid Procedures Order; and (b) the Sale Notice upon the following entities: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee, if any, or, if none formed, the creditors holding the twenty (20) largest unsecured claims as set forth on the list filed with the Debtors' petitions; (iii) all taxing authorities having jurisdiction over any of the Assets subject to the Sale, including the Internal Revenue Service; (iv) the Environmental Protection Agency; (v) the Securities Exchange Commission; (vi) the Food and Drug Administration; (vii) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (viii) all of the Debtors' known creditors; (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order; (x) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Assets; and (xi) any Potential Bidders previously identified or otherwise known to the Debtors (collectively, the "<u>Sale Notice Parties</u>").  In addition, the Debtors will publish notice of the Sale in the national edition of either the *Wall Street Journal National Edition* or *USA Today* or similar publication.

29.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801; and (d) be served on: (i) counsel for the Debtors, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn: Matthew B. McGuire, Esq. (e-mail: mcguire@Irclaw.com) and Joshua B. Brooks, Esq. (e-mail: brooks@lrclaw.com)); and Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, New York, 10007 (Attn: George Shuster, Esq. (e-mail: george.shuster@wilmerhale.com) and Benjamin Loveland, Esq. (email: Benjamin.loveland@wilmerhale.com)); (ii) counsel to the Committee, if any; and (iii) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Joseph Cudia, Esq. (email: Joseph.Cudia@usdoj.gov)).

### F.    Procedures Relating to Executory Contracts and Unexpired Leases, Including Determination of Cure Amounts and Deadlines for Objection to Assumption and Assignment of All Contracts

30.     Given the number of executory contracts and unexpired leases to which the Debtors are a party, the Debtors seek to establish (a) procedures for determining the Cure Amounts and (b) the deadline for objections to the Cure Amounts and/or the proposed assumption and assignment of executory contracts and unexpired leases (collectively, the "Contract Procedures"). The contracts that may be assumed and assigned by the Debtors will be listed on a schedule filed with the Court not less than fourteen (14) days prior to the Sale Objection Deadline (the "Contract Schedule").

31.     Not less than fourteen (14) days prior to the Sale Objection Deadline, the Debtors shall serve by mail a notice, substantially in the form annexed as Exhibit 3 to the Bid Procedures Order (a "Cure Notice"), on the non-Debtor counterparties to all Contracts (collectively, the

"Contract Parties") that the Debtors may assume and assign as a part of any Sale Transaction. To the extent the Contracts Schedule is amended after the Sale Order, the Debtors shall promptly file and serve by mail a supplemental Cure Notice (the "Additional Cure Notice") on the affected non-Debtor counterparties, substantially in the form attached as Exhibit 4 to the Bid Procedures Order.

### i.    *Contract Objections*

32.    To facilitate a prompt resolution of (a) disputes relating to the Cure Amounts and (b) any other objections relating to the assumption and assignment of the Contracts, the Debtors propose the following deadlines and procedures:

a.    The Contract Parties shall have until 4:00 p.m. (ET) on the date that is fourteen (14) days following service of the Cure Notice (the "Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object (a "Contract Objection") to (i) the Cure Amounts listed by the Debtors and to propose alternative Cure Amounts, and/or (ii) the proposed assumption and assignment of the Contracts in connection with the Sale, including, without limitation, the Debtors' ability to assign the Contracts without the Contract Parties' consent;

    i.    ***provided, however,*** that any objections related to the adequate assurance of future performance to be provided by the Successful Bidder (or any designee thereof) may be raised at the Sale Hearing or at a later-scheduled hearing as the Court deems appropriate;

    ii.    ***provided, further, however,*** if the Debtors amend the Cure Notice after the Contract Objection Deadline to add a contract or lease, the non-Debtor party to the added contract or lease shall have until the earlier of (a) fourteen (14) days after service of notice of adding a contract or lease; or (b) the Sale Hearing to submit a Contract Objection with respect to the contract or lease added by the Debtors' amendment (the "Amended Contract Objection Deadline");

    iii.    ***provided, further, however,*** that if the Debtors amend the Cure Notice after the Contract Objection Deadline to reduce the Cure Amount of a Contract, except where such reduction was upon mutual agreement of the parties, the non-Debtor party to the reduced Cure Amount contract or lease shall have until the Amended Contract Objection Deadline to object to the Cure Amount with respect to the contract or lease with the Cure Amount that has been reduced by the Debtors' amendment.

b.  The Debtors, the Contract Party, and the Successful Bidder may consensually resolve the Contract Objection prior to, or after, the Sale Hearing.  In the event the Contract Objection is not resolved, such Contract Objection will be heard at the Sale Hearing or thereafter.  To the extent it is determined that the Cure Amount exceeds the amount set forth in the Contract Schedule, or an objection to assumption or assumption and assignment is sustained with regard to an Assigned Contract the Successful Bidder may determine to not have such Assigned Contract assumed and assigned to it.

c.  Unless a Contract Objection is filed and served before the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable, all Contract Parties shall be:

i.  forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts (other than as may be asserted in an Additional Cure Notice), and the Debtors and the Successful Bidder shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notice or the Additional Cure Notice, as applicable;

ii.  deemed to have consented to the assumption or assumption and assignment of the applicable Contracts;

iii.  forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist (other than as may be asserted in an Additional Cure Notice), that conditions to assignment must be satisfied under such Contracts, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Contracts, including without limitation, adequate assurance of future performance;

iv.  precluded from objecting to the Cure Amounts (if any) and the assumption and assignment; and

v.  barred and estopped from asserting or claiming that an Assigned Contract contains an enforceable consent right.

### ii.  *Designation by Qualified Bidders*

33.  On or before the Bid Deadline, any Qualified Bidder shall, by delivering written notice to the Debtors, provide their initial designation of Contracts on the Contracts Schedule it wishes to become an Assigned Contract.  The Successful Bidder may remove any Assigned Contract from such schedule prior to the Closing.

34.     Immediately prior to the Sale Hearing, the Debtors shall file the list of Assigned Contracts as of such date.

35.     The Debtors request that the Sale Order, among other things:

    a.    authorize and approve the assumption and assignment of the Assigned Contracts to the Successful Bidder upon the Closing, without the need for any further action by any party, pursuant to Bankruptcy Code section 365;

    b.    provide that where the Debtors is unable to establish that a default exists under a Contract, the Cure Amount relating to such Assigned Contract shall be set at $0.00; and

    c.    find that the Successful Bidder has established adequate assurance of future performance necessary to satisfy the requirements of Bankruptcy Code section 365 in respect of the assignment to the Successful Bidder of the Assigned Contracts.

## **RELIEF REQUESTED**

36.     By this Motion, the Debtors seek the entry of two orders of the Court: (a) the Bid Procedures Order: (i) approving the Bid Procedures relating to the sale of substantially all of the Debtors' assets; (ii) approving the Stalking Horse Bid Protections; (iii) scheduling the Sale Hearing and setting objection deadlines with respect to the sale; (iv) approving the form and manner of notice of the Sale and related Auction; (v) establishing procedures to determine Cure Amounts and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases; and (vi) granting related relief; and (b) the Sale Order: (i) authorizing and approving the Sale; (ii) authorizing the Sale free and clear of Encumbrances pursuant to the Successful Bidder; (iii) authorizing the assumption and assignment of the Assigned Contract; and (iv) granting related relief.

37.     The Debtors believe that the proposed Bid Procedures and Sale will maximize the value of the Debtors' assets for all stakeholders by fostering an environment for open and robust bidding on the Debtors' assets.

## BASIS FOR RELIEF REQUESTED

### A.  The Bid Procedures Are Fair and Reasonable and Designed to Not Chill Bidding

38.     Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property.  *See In re Mushroom Transp. Co.,* 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"). In the hope of maximizing the value received by bankruptcy estates, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process.  *See, e.g., In re Fin. News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards,* 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

39.     The Debtors believe that the Bid Procedures are designed to maximize the value received for the Assets and prevent any chilling of potential bids by establishing a competitive and fair bidding process.  The process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing Potential Bidders with ample time and information to submit a timely bid and perform diligence.  The Bid Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price by subjecting the value of the Assets to market testing and permitting prospective buyers to bid on the Assets.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable and that the proposed Bid Procedures will not chill bidding by any Potential Bidders.  Moreover, the proposed Bid

Procedures are fair and appropriate in light of the extensive prepetition marketing process undertaken by the Debtors and their professionals.

40.    Procedures to dispose of assets similar to the proposed Bid Procedures have been approved in many other chapter 11 cases in this District.   *See, e.g., In re EdgeMarc Energy Holdings, LLC*, Case No. 19-11104 (BLS) (Bankr. D. Del. June 21, 2019); *In re Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019); *In re Argos Therapeutics, Inc.*, Case No. 18-12714 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings, Inc.*, Case No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *In re Seastar Holdings, Inc.*, Case No. 18-10039 (CSS) (Bankr. D. Del. Jan. 29, 2018); *In re Peekay Acquisition, LLC*, Case No. 17-11722 (BLS) (Bankr. D. Del. Sep. 7, 2017); *In re Jumio, Inc.*, Case No. 16-10682 (BLS) (Bankr. D. Del. Apr. 21, 2016); *In re City Sports, Inc.*, Case No. 15-12054 (KG) (Bankr. D. Del. Oct. 23, 2015); *In re Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 11, 2015); *In re iGPS Co. LLC*, Case No. 13-11459 (KG) (Bankr. D. Del. July 31, 2013); *Tri-Valley Corp.*, Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); *WP Steel Venture LLC*, Case No. 1211661 (KJC) (Bankr. D. Del. June 21, 2012).   The Debtors thus believe that the proposed Bid Procedures provide an appropriate framework for establishing that the Debtors will receive the best and highest offer for the Assets.   Accordingly, the proposed Bid Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

## B.   <u>The Stalking Horse Bid Protections Are Reasonable and Appropriate</u>

41.    Bid incentives such as the Stalking Horse Bid Protections encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.   The Debtors submit that approval of the Stalking Horse

Bid Protections, subject to the procedures for such approval as are described herein, is justified by the facts and circumstances of this case, whether considered under the business judgment rule or as an administrative expense of the estate. Similar procedures for the selection of stalking horse bidders have been approved in this District in many other chapter 11 cases. *See, e.g., In re Allena Pharmaceuticals, Inc.*, Case No. 22-10842 (KBO) (Bankr. D. Del. Sep. 28, 2022) (approving bid procedures and authorizing debtors to select a stalking horse bidder and grant stalking horse bid protections upon notice to certain parties-in-interest); *In re Armstrong Flooring, Inc.*, Case No. 22-10426 (MFW) (Bankr. D. Del. May 31, 2022) (same); *In re BC Hospitality Group Inc.*, Case No. 20-13103 (BLS) (Bankr. D. Del. Jan. 7, 2021) (approving bid procedures and authorizing debtors to select a stalking horse bidder and grant stalking horse bid protections upon notice to certain parties-in-interest and submission of an order, under certification of counsel, approving such decisions); *In re Templar Energy LLC*, Case No. 20-11441 (BLS) (Bankr. D. Del. June 23, 2020) (same); *In re Carbonlite Holdings LLC*, Case No. 21-10527 (JTD) (Bankr. D. Del. Apr. 9, 2021) (same); *In re Klausner Lumber One, LLC*, Case No. 20-11033 (KBO) (Bankr. D. Del. June 8, 2020) (same); *In re Southland Royalty Company LLC*, Case No. 20-10158 (KBO) (Bankr. D. Del. Apr. 29, 2020) (same).

42.     Approval of the Stalking Horse Bid Protections is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999). In *O'Brien,* the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under section 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of [these fees] depend upon the requesting party's ability to show that the fees were actually necessary to preserve

the value of the estate." *O'Brien*, 181 F.3d at 535.  Here, the Break-Up Fee and Expense Reimbursement should be approved because they will provide a benefit to the Debtors' estates. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, a break-up fee may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, "if the availability of. . . [reimbursement of] expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

43.    The Stalking Horse Bid Protections only will be provided after good faith, arm's length negotiations between a prospective bidder and the Debtors (after consultation with any Committee), which are acting in the best interest of their estates, consistent with their fiduciary duties.  Moreover, the Stalking Horse Bid Protections only will be provided if a Stalking Horse Bidder requires such protections as a condition to the Stalking Horse Bidder's obligation to proceed with a Sale Transaction.  *See In re Reliant Energy Channelview, LP*, 594 F.3d 200 (3d Cir. 2010).

44.    The Debtors will only provide Stalking Horse Bid Protections if doing so will promote the interests of the Debtors' estates to maximize value.  The Termination Payment will promote more competitive bidding for the Debtors' assets by inducing a Stalking Horse Bidder to hold its offer open as a minimum bid on which other bidders and the Debtors can rely.  In doing so, any Stalking Horse Bidder will help lay the foundation for the Debtors' sale process and will serve as a catalyst for other Qualified Bids.  Accordingly, the Termination Payment is appropriate

and any Stalking Horse Bidder is entitled to be compensated for the risk it is assuming and the substantial value it is conferring on the Debtors' estates.

45.     Finally, the Stalking Horse Bid Protections are reasonable in view of the substantial benefits the Debtors would receive from having a Stalking Horse Bid (as defined in the Bid Procedures) serve as a floor for potential bidders, which would confirm that the Debtors receive the highest and best purchase price for the applicable Assets.  A Stalking Horse Bid will provide the Debtors with an opportunity to move forward with a Sale Transaction that has a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Stalking Horse Bid Protections will not deter or chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates. Finally, approval of any Stalking Horse Agreement will be subject to the procedures described herein.

C. **The Proposed Sale Notice, the Proposed Date for the Sale Objection Deadline, the Cure Objection Deadline and the Sale Hearing Are Appropriate**

46.     The Debtors submit that the Sale Objection Deadline is reasonable and appropriate under the circumstances.  Pursuant to Local Rule 9006-1 (c)(ii), [w]here a motion is filed and served in accordance with Local Rule 9006-1 (c)(i), the deadline for objection(s) shall be no later than seven (7) days before the hearing date." Del. Bankr. L.R. 9006-l(c)(ii).  As noted above, the Sale Hearing is more than twenty-one (21) days from notice of this Motion and the Sale Objection Deadline has been scheduled seven (7) days in advance thereof.  As such, the Debtors submit that the proposed Sale Objection Deadline meets the requirements of the Bankruptcy Rules and the Local Rules.

47.     The Debtors submit that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy

Rule 2002 and constitutes good and adequate notice of the Bid Procedures and the subsequent proceedings related thereto, including the proposed dates for: (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadline; and (d) the Sale Hearing.  Therefore, the Debtors respectfully request that the Court approve the proposed notice procedures.

### D. **The Contract Procedures Provide Adequate Notice and Opportunity to Object and Should Be Approved**

48.    Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the courts approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  As discussed in greater detail below, the standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).

49.    The Debtors respectfully submit that the proposed Contract Procedures are appropriate and reasonably tailored to provide the Contract Parties with adequate notice of the proposed assumption and assignment of the applicable Contract, as well as proposed Cure Amounts, if applicable.  Such Contract Parties then will be given an opportunity to object to such notice.  The Contract Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues).  Accordingly, the Debtors submit that implementation of the proposed Contract Procedures is appropriate in these Chapter 11 Cases.

50.    The Contract Procedures comport with the requirements of Bankruptcy Code section 365 (as described fully below) and Bankruptcy Rule 6006, and the non-Debtor contract counterparties' rights to adequate assurance are unaffected and fully preserved.  The Debtors

respectfully submit that the notices required by the Contract Procedures are sufficient to assume and assign the Assigned Contracts because they are reasonably tailored to provide notice and an opportunity to object to the proposed assumption and assignment.  Thus, the Debtors submit that the Contract Procedures should be approved.

**E.   The Sale Is Within the Sound Business Judgment of the Debtors and Should Be Approved**

51.    Ample authority exists for approval of a proposed Sale to a Successful Bidder. Bankruptcy Code section 363(b)(1) provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.   However, courts in the Third Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor.  *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.)*; *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); *Dai-Ichi Kangyo Bank, Ltd. V. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

52.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely: (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business;

(b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtor has obtained a fair and reasonable price; and (d) good faith. *Abbotts Dairies*, 788 F.2d at 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program and holding that the business purpose requirement was fulfilled, because stabilizing turnover rate and increasing morale were necessary to successful reorganization).  The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders* v. *Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

53.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152,

154 (7th Cir. 1993); *Pincus* v. *Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

### F.  A "Sound Business Purpose" Supports the Sale

54.     As set forth in the First Day Declaration, in light of the lack of realistic stand-alone restructuring options, the Debtors have determined, in the exercise of their reasonable business judgment, that the most effective way to maximize the value of their estates for the benefit of their constituents is to sell the Assets pursuant to Bankruptcy Code section 363 to the highest or otherwise best bidder.  To that end, the Debtors, with the assistance of their professionals, have designed the Bid Procedures to promote a fair and open atmosphere for bidding on the Debtors' assets, with the goal of maximizing value to be distributed to creditors of the Debtors' estates.

### G.  Sufficient Notice of the Proposed Sale Has Been Provided to Interested Parties

55.     Pursuant to the Bid Procedures and the notice procedures set forth herein, the Debtors will employ various methods of notification to ensure that all interested and potentially affected parties will be informed of the Sale.  In order to generate the greatest number of bidders possible for the Sale and to satisfy the requirements of Bankruptcy Rule 2002, the Debtors will serve the Sale Notice upon the Sale Notice Parties.

56.     Additionally, the Debtors will file and serve the Cure Notice on all non-Debtor counterparties to the Contracts providing them with notice of this Motion, the potential assumption and assignment of Contracts and the Debtors' proposed Cure Amount.  The Debtors submit that more than ample notice of the Sale has been provided to interested parties under the facts and circumstances of these Chapter 11 Cases.

**H.  The Proposed Sale Is for a Fair and Reasonable Price**

57.     At the Sale Hearing, the Debtors will establish that the purchase price for the Assets is fair and reasonable.  The Bid Procedures have been designed to ensure that the highest or otherwise best offer for the Assets will be attained.  With the assistance of SSG, the Debtors continue to: (a) conduct a comprehensive marketing process in order to maximize value; (b) solicit the interest of various potential strategic and financial buyers; and (c) entertain offers for an alternative sale transaction that will maximize the value of the Debtors' business.  The Debtors expect that their continued marketing efforts will result in the submission of one or more competing bids prior to the proposed Bid Deadline of March 29, 2024.

58.     Because the ultimate purchase price for the Assets will be determined in accordance with the Court-approved Bid Procedures at an Auction, it will be fair and reasonable as contemplated by Bankruptcy Code section 363.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 149 (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re Nat'l. Health & Safety Corp.*, 1999 Bankr. LEXIS 1126 (Bankr. E.D. Pa. Sept. 2, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

**I.  The Proposed Sale Has Been Negotiated at Arm's Length and in Good Faith**

59.     The "good faith" prong of *Abbotts Dairies* standard is also satisfied.  The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the Sale.  Bankruptcy Code section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not

> affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

60.     Bankruptcy Code section 363(m) thus protects the buyer of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the Assets if the order allowing the sale is reversed on appeal.  By its terms, Bankruptcy Code section 363(m) applies to sales of interests in tangible assets, such as the Assets.

61.     The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Successful Bidder's purchase agreement will be an arm's-length transaction, in which the Successful Bidder acted in good faith.  The Debtors and the Successful Bidder will have negotiated the Successful Bidder's purchase agreement in good faith and without collusion or fraud of any kind.  The Successful Bidder will not have engaged in collusion or any conduct that would otherwise control or tend to control the sale price as between or among Potential Bidders.  The Bid Procedures are designed to maximize rather than chill competitive bidding and the Auction promotes an open and competitive sale process.  The Debtors will have their own legal counsel in negotiations over the Successful Bid and will have their own legal counsel to negotiate on their behalf throughout the Auction and the Sale.  Accordingly, the Debtors request that the Court make the finding at the Sale Hearing that the Successful Bidder, including, if applicable, the Stalking Horse Bidder, has purchased the Assets in good faith within the meaning of Bankruptcy Code section 363(m).

### J.    All Pertinent Information Regarding the Proposed Sale Has Been Fully Disclosed

62.     The Debtors have presented the proposed asset sale openly and in good faith.  The Debtors have fully disclosed and requested the Court approval of all of the terms and conditions

of the proposed Sale.  Sufficient and adequate notice of this Motion has been provided to interested

parties and such parties will receive further notice of the Sale and all relevant dates and deadlines

related thereto through the Court-approved Sale Notice.

63.      The Debtors will be prepared to introduce evidence at the Sale Hearing regarding

the arm's-length, good faith nature of the Auction and the negotiation of any agreement with a

Successful Bidder.   Indeed, the Debtors will be able to demonstrate that the Bid from the

Successful Bidder represents the highest or otherwise best bid available to the Debtors for the

Assets following a robust marketing and competitive bidding process.  Accordingly, any proposed

Sale will be proposed and fully disclosed in good faith and represents the sound business judgment

of the Debtors; and, as such, is entitled to Court approval.

### K.   The Sale Satisfies the Requirements of Bankruptcy Code Section 363(1)

64.      Under Bankruptcy Code section 363(f), a debtor-in-possession may sell all or any

part of its property free and clear of any and all liens, claims or interests in such property if: (a) such

a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim

or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is

greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a

*bona fide* dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal

or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *In re*

*Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003); *Citicorp Homeowners Serv., Inc.* v. *Elliot*

*(In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

65.      Here, the Sale satisfies the criteria set forth in Bankruptcy Code section 363(f).  The

Debtors believe that, at a minimum, it satisfies the fifth prong of section 363(f) because the holders

of any liens, claims, encumbrances, or interests could be compelled, in a legal or equitable

proceeding, to accept a monetary satisfaction equal to the amount of their lien, claim, encumbrance, or interest.

**L.    The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

66.    As explained above, Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."   11 U.S.C. § 365(a).   The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See. e.g., Stable Mews Assoc.*, 41 B.R. at 596.  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).   The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing* Co. v. *Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

67.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

68.     Bankruptcy Code section 365(f) provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

69.     Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Moreover, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor.  This provision provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default. . . ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

70.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc.* v. *Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

71.     To the extent any defaults exist under any Assigned Contract sought to be assumed by the Debtors and assigned to the Successful Bidder such defaults will be cured as required under Bankruptcy Code section 365(b)(1).

72.     The Debtors and/or the Successful Bidder will establish at the Sale Hearing that the Successful Bidder has the financial capability to satisfy any and all obligations they will incur in connection with the Assigned Contracts.  In addition, to be a Qualified Bid, any Qualified Bidder must establish it has the financial capability to satisfy any and all obligations it will incur in connection with the Assigned Contracts.  Further, facts will be further adduced at the Sale Hearing to show the financial wherewithal of the Successful Bidder, its experience in the industry and its willingness and ability to satisfy obligations under the Assigned Contracts.  Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required by

Bankruptcy Code section 365(b)(1)(C), the Debtors submit that the Court should authorize the assumption and assignment of the Assigned Contracts by the Debtors, effective upon the Closing of the proposed Sale.

73.    Additionally, the contract procedures set forth herein provide that all of the counterparties to Contracts with the Debtors will be given notice of this Sale Motion and through the Cure Notice and any Additional Cure Notice have been provided with notice of the potential assumption and assignment of their Contract and the Debtors' proposed Cure Amounts associated therewith.   Based on the foregoing, the Debtors respectfully submit that their assumption and assignment of the Assigned Contracts satisfies the requirements under Bankruptcy Code section 365(f)(2)(A) and (B).

**M.    Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

74.    The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." *See* Fed. R. Bankr. P. 6004(h).  As set forth above, the relief requested herein is essential to maximize the value of the Debtors' business for the benefit of all stakeholders.

75.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to Bankruptcy Code section 363 are automatically stayed for fourteen (14) days after entry of the order.  *See id.*  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(g).

76.     Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to Bankruptcy Code section 365(f) for fourteen (14) days, unless the court orders otherwise.  *See* Fed. R. Bankr. P. 6006(d).

77.     To preserve the value of the Assets and limit the costs of administering and preserving such assets, it is critical that the Debtors close the Sale as soon as possible after all closing conditions have been achieved or waived.  Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

78.     Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

## NOTICE AND NO PRIOR REQUEST

79.     Notice of this Motion has been given to the Sale Notice Parties, but excluding the Debtors' known creditors.  Notice of the Motion as it relates to the approval of the Sale and related requests will be given to the Sale Notice Parties.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

80.     No prior Motion for the relief requested herein has been made to this or any other court.

81.     WHEREFORE, the Debtors respectfully request: (i) entry of the proposed Bid Procedures Order; (ii) entry of the proposed Sale Order; and (iii) such other and further relief as the Court deems just and proper.

Dated: February 1, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Joshua B. Brooks*
Matthew B. McGuire (No. 4366)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: mcguire@lrclaw.com
      brooks@lrclaw.com

*Proposed Counsel for the Debtors*
*and Debtors-In-Possession*

   -   *and* -

**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**

George W. Shuster, Jr.
Benjamin Loveland
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8000
Email: george.shuster@wilmerhale.com
      benjamin.loveland@wilmerhale.com

*Proposed Special Corporate Counsel for*
*the Debtors and Debtors-in-Possession*