# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INVIVO THERAPEUTICS CORPORATION, *et al.*,[1] | Case No. 24-10137 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 138 & 139** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF (A) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE PLAN

**LANDIS RATH & COBB LLP**
Matthew B. McGuire (No. 4366)
Joshua B. Brooks (No. 6765)
George A. Williams III (No. 6964)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: mcguire@lrclaw.com
        brooks@lrclaw.com
        williams@lrclaw.com

*Counsel to the Debtors and
Debtors-In-Possession*

Dated: June 17, 2024

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: InVivo Therapeutics Corporation (6670) and InVivo Therapeutics Holdings Corp. (8166).  The Debtors' mailing address is 1500 District Avenue, Burlington, MA 01803.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    I.      The Debtors' Business ..............................................................................2

    II.     Events Leading to the Bankruptcy Filing ...............................................3

          A.     Operational Challenges ...............................................................3

          B.     Restructuring Efforts....................................................................3

          C.     The ARE Settlement ....................................................................5

    III.    The Chapter 11 Cases ...............................................................................6

          A.     First Day Relief............................................................................6

          B.     The Sale Process ..........................................................................6

          C.     Schedules and Statements and the Bar Date Motion ..................7

          D.     The Plan and the Disclosure Statement ......................................8

    IV.    Responses to Confirmation of the Plan and Final Approval of the
          Disclosure Statement ................................................................................10

THE DISCLOSURE STATEMENT SATISFIES THE REQUIREMENTS OF
          BANKRUPTCY CODE SECTION 1125..........................................................10

THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS...................12

    I.      The Plan Complies with Bankruptcy Code section 1129(a)...................12

          A.     Bankruptcy Code section 1129(a)(1) .......................................12

                1.     Bankruptcy Code section 1122 – Classification of Claims
                      and Interests ....................................................................13

                 2.     Compliance with Bankruptcy Code section 1123(a) –
                      Mandatory Contents of the Plan .....................................15

                 3.     Bankruptcy Code section 1123(b) – Discretionary Contents
                        of the Plan ......................................................................17

          B.     Bankruptcy Code Section 1129(a)(2) .......................................17

C.     Bankruptcy Code section 1129(a)(3) ........................................20

D.     Bankruptcy Code section 1129(a)(4) ........................................22

E.     Bankruptcy Code section 1129(a)(5) ........................................22

F.     Bankruptcy Code section 1129(a)(6) ........................................23

G.     Bankruptcy Code section 1129(a)(7) ........................................23

H.     Bankruptcy Code section 1129(a)(8) ........................................26

I.     Bankruptcy Code section 1129(a)(9) ........................................27

J.     Bankruptcy Code section 1129(a)(10) ......................................28

K.     Bankruptcy Code section 1129(a)(11) ......................................29

L.     Bankruptcy Code section 1129(a)(12) ......................................30

M.     Bankruptcy Code section 1129(a)(13) ......................................30

II.     Bankruptcy Code Section 1129(b) ........................................31

A.     The Plan Is Fair and Equitable with Respect to All Impaired Classes ........................................31

B.     The Plan Does Not Discriminate Unfairly with Respect to the Impaired Classes ........................................32

III.     Section 1129(c) – No Other Plan Has Been Proposed or Confirmed ..................33

IV.     Section 1129(d) – The Plan's Purpose Is Consistent with the Bankruptcy Code ........................................34

OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE .............................34

I.     The Plan's Releases and Exculpation Provisions Are Appropriate and Should Be Approved ........................................34

A.     The Debtor Releases ........................................34

B.     The Exculpation Provision ........................................36

II.     Substantive Consolidation of the Debtors' Estates ................................38

WAIVER OF STAY ........................................39

CONCLUSION ........................................40

## **TABLE OF AUTHORITIES**

**Cases**

*Century Glove, Inc. v. First Am. Bank N.Y.*, 860 F.2d 94 (3d Cir. 1988) ...................................... 9

*CoreStates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33 (E.D. Pa. 1996) ............................ 21

*Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
    116 F.3d 790 (5th Cir. 1997) ........................................................................................... 22

*Hanson v. First Bank of S.D.*, 828 F.2d 1310 (8th Cir. 1987) ........................................................ 19

*In re 203 N. LaSalle*, 190 B.R. 567 (Bankr. N.D. Ill. 1995) ........................................................... 34

*In re Aleris Int'l, Inc.*,
    2010 Bankr. LEXIS 2997 (Bankr. D. Del. May 3, 2010) ............................................... 30

*In re AOV Indus.*, 31 B.R. 1005 (D.D.C. 1983) .............................................................................. 24

*In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990) .................................................... 31

*In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ................................. passim

*In re Aztec Co.*, 107 B.R. 585 (Bankr. M.D. Tenn. 1989) .............................................................. 35

*In re Block Shim Dev. Co.*,
    939 F.2d 289 (5th Cir. 1991) ........................................................................................... 21

*In re Bowles*, 48 B.R. 502 (Bankr. E.D. Va. 1985) ........................................................................ 34

*In re Cellular Info. Sys., Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994); ......................................... 30

*In re Century Glove, Inc.*, 1993 LEXIS 2286 (D. Del. Feb. 10, 1993) ........................................... 21

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) ................................................... 19, 21

*In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) ........................................... 20

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) ..................................... 13, 34

*In re Crdentia Corp.*, 2010 Bankr. LEXIS 2838 (Bankr. D. Del. May 26, 2010) ........................ 23

*In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) ............................ 25

*In re DBSD North America, Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009) .................................... 39

*In re Eagle-Picher Indus., Inc.*, 203 B.R. 256 (S.D. Ohio 1996) ................................ 11, 13, 22, 24

*In re Econ. Lodging Sys., Inc.*,
   205 B.R. 862 (Bankr. N.D. Ohio 1997) ................................................................. 24

*In re Elm Creek Joint Venture*, 93 B.R. 105 (Bankr. W.D. Tex. 1988) ........................................ 31

*In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003) ......................................................... 37

*In re Freymiller Trucking, Inc.*, 190 B.R. 913 (Bankr. W.D. Okla. 1996) .............................. 34

*In re HSH Del. GP LLC*, Case No. 10-10187 (MFW) (Bankr. D. Del. Jan. 18, 2011) ............... 40

*In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) .................................. 38, 39

*In re Jartran, Inc.*, 44 B.R. 331 (Bankr. N.D. Ill. 1984) ......................................................... 25

*In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir 1987) ...................................................... 13

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................ 23, 31, 35

*In re Koelbl*, 751 F.2d 137 (2d Cir. 1984) ............................................................................. 22

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ................................................................. 34

*In re Martin*, 66 B.R. 921 (Bankr. D. Mont. 1986) ............................................................... 30

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) .............................................................. 41

*In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................... 10

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) ..................................................... 17, 41

*In re Revco*, 131 B.R. 615 (Bankr. N.D. Ohio 1990) .............................................................. 32

*In re Rivers End Apartments, Ltd.*, 167 B.R. 470 (Bankr. S.D. Ohio 1994); ............................. 31

*In re Spansion, Inc.*,
   426 B.R. 144 (Bankr. D. Del 2010) ................................................................. 39

*In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ..................................................... 18, 31

*In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr. S.D.N.Y. 1984) ............................... 11

*In re Tranel*,
   940 F.2d 1168 (8th Cir. 1991 ................................................................. 24

*In re Tribune Co.*, 476 B.R. 843 (Bankr. D. Del 2012) ........................................................... 13

*In re Victory Constr. Co.*, 42 B.R. 145 (Bankr. C.D. Cal. 1984) ............................................... 25

*In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ....................................................... 37

*In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ............................................... 20, 37

*In the Matter of Sound Radio, Inc.*, 93 B.R. 849 (Bankr. D.N.J. 1988)........................................ 21

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) ........................................................................................................................... 13

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988).. 12, 31

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314 (3d Cir. 2003) ............................................................................................................................... 9

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650 (9th Cir. 1997) .......................................................................................... 35

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 Fed. App'x. 1 (3d Cir. Aug. 2, 2007)............................................................................................. 9

*McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524 (11th Cir. 1995)...... 20

*Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180 (3d Cir. 2001) .................................... 44

*Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715 (Bankr. E.D. Cal. 1992).................................................................................... 17

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154 (3d Cir. 1999).................................................................................................................. 20

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988)......................... 9

*Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336 (8th Cir. 1985) .... 31

*Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009).................................................................................... 42

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del. 2010) ................................................................................................................................ 39

**Statutes**

11 U.S.C. § 1122 .......................................................................................................................... 16

11 U.S.C. § 1123(a) ................................................................................................................. 18, 19

11 U.S.C. § 1123(b) ...................................................................................................................... 20

11 U.S.C. § 1125........................................................................................................... 13, 21, 42

11 U.S.C. § 1126(c) ........................................................................................... 29

11 U.S.C. § 1129(a)(1) ................................................................................... passim

11 U.S.C. § 1129(a)(4) ....................................................................................... 25

11 U.S.C. § 1129(b)(1) ....................................................................................... 35

11 U.S.C. § 1129(b)(2) ....................................................................................... 35

**Other Authorities**

COLLIER ON BANKRUPTCY ............................................................................ 19, 33

H.R. Rep. No. 95-595(1977) .......................................................................... 16, 21

S. Rep. No. 95-989 (1978) ............................................................................. 16, 21

**Rules**

Fed. R. Bankr. P 3020 ....................................................................................... 45

## INTRODUCTION

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this memorandum of law (the "Memorandum of Law") in support of (i) final approval of the *Disclosure Statement for the Joint Plan of Liquidation of InVivo Therapeutics Corporation and InVivo Therapeutics Holdings Corp. Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 139] (as modified, revised, supplemented, and amended including all attachments and exhibits thereto, the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (as amended or modified, the "Bankruptcy Code") and (ii) confirmation of the *Joint Plan of Liquidation of InVivo Therapeutics Corporation and InVivo Therapeutics Holdings Corp. Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 138] (as modified, revised, supplemented and amended including all attachments and exhibits thereto, the "Plan"),[1] pursuant to section 1129 of the Bankruptcy Code.  In addition, as set forth herein, the Debtors request a waiver of the fourteen (14) day stay of the order confirming the Plan imposed by rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PRELIMINARY STATEMENT

On February 1, 2024 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by each filing a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  After exploring out-of-court strategic alternatives, the Debtors concluded that the best way to maximize value for the benefit of all stakeholders was through filing for Chapter 11 protection and pursuing an orderly sale of their assets in a controlled, court-supervised process (the "Sale Process").  The

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Richard Christopher in Support of the Debtors' Chapter 11 Petition and First Day Pleadings* [D.I. 3] (the "First Day Declaration"), the Plan or the Disclosure Statement, as applicable.

Plan is the culmination of the Debtors' substantial efforts over the past five months to bring these Chapter 11 Cases to a fully consensual, value-maximizing close. The Plan provides for the liquidation and conversion of all of the Debtors' remaining assets to cash and the distribution of the net proceeds realized therefrom, along with existing cash, to holders of Allowed Claims or Allowed Interests in accordance with the priorities established in the Bankruptcy Code.

As set forth herein, in the *Declaration of Richard Christopher in Support of Confirmation of the Joint Plan of Liquidation of InVivo Therapeutics Corporation and InVivo Therapeutics Holdings Corp. Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 228] (the "Voting Declaration"), and as will be shown at the confirmation hearing, the Disclosure Statement and the Plan meet all of the requirements under the Bankruptcy Code to be approved and confirmed. Accordingly, the Debtors request that the Disclosure Statement be approved on a final basis and the Plan be confirmed.

## STATEMENT OF FACTS

### I.    The Debtors' Business

1.    The Debtors were a research and clinical-stage biomaterials and biotechnology company with a focus on treatment of spinal cord injuries ("SCI"), with the goal of developing treatment options intended to provide meaningful improvement in patient outcomes following SCI.

2.    Prior to the Petition Date, the Debtors pursued development of their investigational Neuro-Spinal Scaffold implant (the "NSS Implant"), a bioresorbable polymer scaffold that is designed for implementation at the site of injury with a spinal cord and is intended to treat acute SCI. The NSS Implant is intended to promote side-by-side healing by supporting the surrounding tissue after injury, aiming to minimize expansion of areas of necrosis and provide a biomaterial substrate for the body's own healing and repair processes.

## II.    Events Leading to the Bankruptcy Filing

### A.    Operational Challenges

3.    Despite significant investment and promising results in initial clinical trials, the Debtors were unable to continue clinical development of the NSS Implant due to setbacks in subsequent clinical trials and financial constraints.  In particular, in March of 2023, the Debtors announced that data from their most recent and only active clinical trial had failed to meet the pre-defined success criteria and primary endpoint for the study.  Having no other program assets besides the NSS Implant that could support continued operations or attract new financing opportunities prior to the Petition Date, the Debtors terminated the development of the NSS Implant and pivoted to a wind-down and asset monetization strategy in order to maximize the value of their enterprise for their constituents.

### B.    Restructuring Efforts

4.    Beginning in March of 2023, the Debtors began exploring strategic alternatives to maximize value for all stakeholders, including marketing efforts for the NSS Implant and the exploration of a sale of the Debtors' entire business as well as other possible in-licensing and program acquisition opportunities that could provide a path forward for the company.  For the NSS Implant, the Debtors conducted a broad outreach effort to existing therapeutic companies, universities and advocacy organizations that it was aware of or had relationships within the spinal cord injury space.  Such inquiries were directed to companies or groups who the Debtors' believed may be interested in potentially purchasing the NSS Implant as a stand-alone development opportunity or in combination with other therapeutics that such companies have in development. The Debtors had similar outreaches and dialogues with firms who also specialized in ex-US partnering efforts for their NSS Implant that had previously expressed interest in working with the Debtors.  The Debtors' representatives also attended various partnering conferences to meet with

companies of these profiles. Despite various conversations and meetings with representatives from the entities who responded, no entity had expressed interest in acquiring the NSS Implant for continued development or research.

5.      Also starting in March 2023, the Debtors conducted outreach efforts to several investment banks regarding the potential sale of their business or other strategic opportunities for the Debtors, including reverse mergers. All of the banks noted the significant challenges that the Debtors could potentially face in the pursuit of a reverse merger or other strategic transaction and the small likelihood of success given a variety of external factors, including the impact of the recent economic downturn in the U.S. and global financial markets. As a result, the banks were unwilling to formally engage with the Debtors to search for a strategic partner. Despite the Debtors' diligent search and marketing efforts, no credible or realistic opportunities materialized as a potential alternative to the Debtors seeking relief under chapter 11 of the Bankruptcy Code.

6.      In order to maximize the outreach to potential purchasers of their assets, on July 12, 2023, the Debtors retained SSG Advisors, LLC ("SSG") as investment banker to continue the marketing process previously commenced by the Debtors. Pursuant to the terms of its engagement by the Debtors, SSG was tasked with initiating and conducting discussions with prospective purchasers and investors in connection with any sale transaction, and advising the Debtors in any related negotiations. Following its engagement, SSG undertook a robust process of searching for asset purchasers in the summer and fall of 2023, contacting a total of 205 target potential purchasers and executing one non-disclosure agreement with an interested party. Unfortunately, no potential purchasers submitted bids to purchase the Debtors' assets at that time.

7.      The Debtors also explored the possibility of in-licensing or acquiring other technologies that might, together with new financing to support those technologies, provide a path

forward for the company.  The Debtors performed significant technological and financial diligence with respect to this type of alternative, but the company could not overcome the difficulty of rebuilding and funding a research platform around the concepts evaluated.

### C.    The ARE Settlement

8.      ARE, a subsidiary of Alexandria Real Estate Equities, Inc., is the owner of the Debtors' former corporate headquarters located at One Kendall Square, Suite B14402, Cambridge, Massachusetts 02139.  The Debtors and ARE entered into a lease agreement for that property dated May 28, 2021, and an amendment to that lease dated November 23, 2021 (as amended, the "ARE Lease").  The ARE Lease was set to expire on December 31, 2024.  In light of the Debtors' decision to suspend development of the NSS Implant, the Debtors no longer needed the leased property, and in order to maximize value of the Debtors' estates, the Debtors negotiated a consensual termination of the ARE Lease.

9.      On August 29, 2023, the Debtors entered into an agreement with ARE to terminate the ARE Lease and resolve ARE's claims arising therefrom (the "ARE Settlement").  Under the material terms of the ARE Settlement, the parties agreed to a surrender of the property and termination of the agreement as of August 31, 2023.  The Debtors agreed to pay ARE a termination payment of $679,111.00 (equivalent to 11.5 months of rent under the ARE Lease), and to grant ARE a claim in these Chapter 11 Cases, subordinated to all other general unsecured claims, in the amount of $54,527.00 (equivalent to ARE's reletting expenses and 0.5 months of rent under the ARE Lease (the "ARE Subordinated Claim"), the purpose of which was to allow ARE to be made whole on its claims only if all other creditors of the Debtors are paid in full.  To assist with the formation of a confirmable chapter 11 plan in these Chapter 11 Cases, ARE agreed to vote the ARE Subordinated Claim in favor of the Plan.

III.    **The Chapter 11 Cases**

    A.    **First Day Relief**

    10.    On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, permitting the Debtors to meet certain obligations to their employees, continued maintenance of their bank accounts and    continued payment of certain prepetition taxes, governmental assessments and related fees following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions, the relief requested therein and the evidence in support thereof is set forth in the First Day Declaration, filed on the Petition Date.

    B.    **The Sale Process**

    11.    As explained above, the Debtors filed their Chapter 11 Cases to engage in a process to sell substantially all of their assets so that they could maximize the value of their estates for the benefit of all of their constituents.  To that end, on the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Orders: (A)(I) Approving Bidding Procedures Relating to the Sale of Substantially Al of the Debtors' Assets, (II) Approving Stalking Horse Bid Protections, (III) Scheduling a Hearing to Consider the Sale, (IV) Approving the Form and Manner of Notice of Sale by Auction, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 18]  (the "Sale Motion").  By order

dated February 22, 2024 [D.I. 79] (the "<u>Bid Procedures Order</u>"), the Court approved the bidding procedures in connection with the Sale Motion.

12.    Pursuant to the Sale Motion and Bid Procedures Order, SSG continued to market the Debtors' assets.  Ultimately, the Debtors received no Qualified Bids for the Assets and canceled the Auction for the sale of their assets.

13.    Following the cancellation of the Auction, Globus Medical, Inc. ("<u>Globus</u>") contacted the Debtors with interest in purchasing certain of the Debtors' assets, including, among other things, the license and executory contracts relating to the Debtors' NSS Implant development program (the "<u>NSS Implant Program</u>").  After Globus and the Debtors undertook diligence efforts, the Debtors received a Qualified Bid from Globus and determined that it was the highest and otherwise best offer that the Debtors would receive for the sale of their assets.  Accordingly, the Debtors negotiated and entered into an asset purchase agreement with Globus to effectuate the sale of the NSS Implant Program.  The proposed sale of the NSS Implant Program remains subject to scrutiny from the Court, and the Court set a hearing for July 9, 2024 at 10:30 a.m. (prevailing Eastern Time) to consider approval of the sale and asset purchase agreement.

14.    To the extent any remaining assets are not monetized or otherwise disposed of prior to the Effective Date of the Plan, the Plan provides that the Liquidation Trustee will monetize or otherwise dispose of such assets and distribute the proceeds thereof in accordance with the terms of the Plan.

### C.    Schedules and Statements and the Bar Date Motion

15.    On February 15, 2024, the Debtors filed their *Schedules of Assets and Liabilities* and *Statements of Financial Affairs* [D.I. 60–63] (as amended or modified and together as, the "<u>Schedules and Statements</u>").  On March 7, 2024, the U.S. Trustee held the meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "<u>341 Meeting</u>").

16.     On March 26, 2024, the Court entered the *Order Granting Motion of the Debtors for Entry of an Order (A) Establishing Bar Dates for Filing Proofs of Claim and Interest, (B) Approving the Form and Manner for Filing Proofs of Claim or Interest and (C) Approving Notice Thereof* [D.I. 124] (the "Bar Date Order").  Pursuant to the Bar Date Order, each person or Entity asserting (i) a Claim against the Debtors that arose (or was deemed to have arisen) before the Petition Date and/or (ii) any right to payment constituting a cost or administrative expense of administration of the Debtors' Chapter 11 Cases that arose, accrued, or otherwise became due and payable or may have arisen, accrued or otherwise become due and payable at any time during the period from the Petition Date through and including March 31, 2024, were required to file proofs of claim against the Debtors on or before April 19, 2024 at 4:00 p.m. (prevailing Eastern Time). All persons or entities holding an equity security interest in the Debtors were also required to file a proof of interest on account of the ownership of such equity security interest on or before April 19, 2024 at 4:00 p.m. (prevailing Eastern Time).  Additionally, pursuant to the Bar Date Order, the Court established July 30, 2024 at 4:00 p.m. (prevailing Eastern Time) as the deadline for all governmental units holding claims (whether secured, unsecured priority or unsecured non-priority) that arose (or are deemed to have arisen) before the Petition Date to file proofs of claim.

**D.     The Plan and the Disclosure Statement**

17.     The Debtors filed the Plan and Disclosure Statement on April 8, 2024.  *See* D.I. 138 and 139.  The solicitation versions of the Plan and the Disclosure Statement were filed on April 29, 2024.  *See* D.I. 168 and 169.

18.     The Disclosure Statement is the product of the Debtors' extensive review and analysis of their business, assets and liabilities, and circumstances leading to the Chapter 11 Cases. The Disclosure Statement provides information regarding: (a) the terms of the Plan, including a summary of the classifications and treatment of all Classes of Claims and Interests; (b) the

distributions to holders of Allowed Claims and Allowed Interests; (c) the effect of the Plan on holders of Claims and Interests and other parties in interest thereunder; (d) the estimated amount of Claims that will ultimately be Allowed; (e) certain risk factors to consider that may affect the Plan; (f) certain tax issues related to the Plan and distributions; and (g) the means for implementation of the Plan.

19.     The Plan classifies holders of Claims and Interests into certain Classes for all purposes, including with respect to voting rights, if any, as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ARE Subordinated Claims | Impaired | Entitled to Vote |
| 6 | Interests | Impaired | Entitled to Vote |

20.     As set forth in the chart above, Class 4 (General Unsecured Claims), Class 5 (ARE Subordinated Claims), and Class 6 (Interests) were entitled to vote on the Plan (the "Voting Classes").  All other holders of Claims were not entitled to vote on the Plan because each such holder holds a Claim presumed to accept under the Plan.  As such, the Debtors did not solicit votes from holders of Claims in Classes 1, 2, and 3.

21.     The deadline for the Voting Classes to cast their ballots was June 14, 2024 at 5:00 p.m. (prevailing Eastern Time).  As set forth in the *Declaration of Jeffrey Miller Regarding the Solicitation and Tabulation of Votes on the Debtors' Joint Chapter 11 Plan of Liquidation* [D.I. 225] (the "Voting Declaration"), the holders of Claims or Interests in the Voting Classes accepted the Plan.  To be sure, one hundred percent (100%) of all Ballots cast by Holders of Claims in Class 4 and Class 5 voted to accept the Plan representing $55,207.00 voting dollars, and approximately sixty-nine percent (69%) of all Ballots cast by Holders of Interests in Class 6 voted

to accept the Plan representing 97.71% voting shares.  *See* Voting Declaration, Exhibit A.  The Debtors received three additional votes from insiders in favor of the Plan in Class 4.  *See* Voting Declaration, Exhibit B.  These insider votes were excluded from the tabulation of votes.

## IV.     Responses to Confirmation of the Plan and Final Approval of the Disclosure Statement

22.     The deadline to object to confirmation of the Plan and final approval of the adequacy of the Disclosure Statement was June 14, 2024 at 4:00 p.m. (prevailing Eastern Time). The Debtors have received informal comments to the Plan and Disclosure Statement (collectively, the "Responses") from only the U.S. Trustee and have resolved all such Responses.  No other objections or responses were received from any other party-in-interest.

## THE DISCLOSURE STATEMENT SATISFIES THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 1125

23.     The Debtors request that the Court approve the Disclosure Statement as containing "adequate information" in accordance with Bankruptcy Code section 1125 on a final basis. Bankruptcy Code section 1125(b) states that "[a]n acceptance or rejection of a plan may not be solicited . . . unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."   11 U.S.C. § 1125(b).   In turn, Bankruptcy Code section 1125(a) defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the

case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a).

24.     The primary purpose of a disclosure statement is to provide information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders entitled to vote on the plan.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003); *see also Century Glove, Inc. v. First Am. Bank N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

25.     Bankruptcy courts have broad discretion in determining whether a disclosure statement contains adequate information based on the unique facts and circumstances of each case. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 507 (D.N.J. 2005), *aff'd*, 241 Fed. App'x. 1 (3d Cir. Aug. 2, 2007) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement."); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("The general language of the statute and its surrounding legislative history make clear that the determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.") (internal quotations omitted).

26.     In accordance with Bankruptcy Code section 1125, the Disclosure Statement provides "adequate information" to allow holders of Claims and Interests entitled to vote to make an informed decision on the Plan.  The Disclosure Statement is the product of the Debtors' extensive review and analysis of their business, assets and liabilities, and circumstances leading to

the Chapter 11 Cases.  The Disclosure Statement provides information regarding: (a) the terms of

the Plan, including a summary of the classifications and treatment of all Classes of Claims and

Interests; (b) the distributions to holders of Allowed Claims or Allowed Interests; (c) the effect of

the Plan on holders of Claims and Interests and other parties in interest thereunder; (d) the Claims

asserted against the Debtors and the estimated amount of Claims that ultimately will be Allowed;

(e) certain risk factors to consider that may affect the Plan; (f) certain tax issues related to the Plan

and distributions; and (g) the means for implementation of the Plan.  Accordingly, the Debtors

believe that the Disclosure Statement complies with all aspects of Bankruptcy Code section 1125

and contains information more than sufficient for a hypothetical reasonable investor to make an

informed judgment about the Plan.

27.     Accordingly, for the foregoing reasons the Debtors submit that the Disclosure

Statement contains adequate information within the meaning of Bankruptcy Code section 1125(a)

and should be approved on a final basis.

## THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS

28.     To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan

satisfies the applicable provisions of Bankruptcy Code section 1129 by a preponderance of the

evidence.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006).  As set forth

below and based on the record and filings in these Chapter 11 Cases and as may be further

demonstrated at the Confirmation Hearing, the Plan meets all applicable requirements of

Bankruptcy Code section 1129 and should be confirmed.

## I.      The Plan Complies with Bankruptcy Code section 1129(a)

### A.      Bankruptcy Code section 1129(a)(1)

29.     The Plan complies with Bankruptcy Code section 1129(a)(1), which provides that

a plan may be confirmed only if "[t]he plan complies with the applicable provisions of this title."

11 U.S.C. § 1129(a)(1); *see also In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 270-73 (S.D. Ohio 1996) (examining each requirement of chapter 11 to demonstrate that Bankruptcy Code section 1129(a)(1) was satisfied); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (stating that "[i]n order for a plan of reorganization to pass muster . . . it must comply with all the requirements of Chapter 11").

30.    The legislative history of Bankruptcy Code section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that a plan complies with Bankruptcy Code sections 1122 and 1123, which govern classification of claims and interests and the contents of a plan, respectively.  *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 (1977); *see also Kane v. Johns-Manville Corp. (In re Johns Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988) (holding that legislative history indicates that Section 1129(a)(1) was intended to require compliance with Sections 1122 and 1123).

### 1.    Bankruptcy Code section 1122 – Classification of Claims and Interests

31.    Bankruptcy Code section 1122 provides that the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122.  Courts consistently have held that Bankruptcy Code section 1122(a) is satisfied so long as similar claims are classified together.  *See In re Armstrong World Indus.*, 348 B.R. at 160 (holding that Bankruptcy Code section 1122(a) was satisfied where similar claims were classified together); *In re Eagle-Picher Indus.*, 203 B.R. at 270 (same).

32.    Accordingly, the sole mandatory obligation of section 1122(a) is that substantially

similar claims may be classified together. *In re Tribune Co.*, 476 B.R. 843, 854 (Bankr. D. Del 2012). Section 1122(a) is, in fact, permissive inasmuch as "it does *not* provide that *all* similar claims must be placed in the same class." *Id.* at 855 (emphasis in original); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping of similar claims in different classes"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) (explaining the Bankruptcy Code "does not expressly prohibit placing 'substantially similar' claims in separate classes.").

33.     The Plan classifies Claims and Interests in accordance with Bankruptcy Code section 1122(a), as each of the Plan's Classes contains Claims or Interests that share the same priority status, contractual rights and enforcement rights against the Debtors' estates. In particular, Article III of the Plan segregates into separate Classes:[2] Class 1 (Secured Tax Claims), Class 2 (Other Secured Claims), Class 3 (Other Priority Claims), Class 4 (General Unsecured Claims), Class 5 (ARE Subordinated Claims), and Class 6 (Interests). The number of Classes in the Plan reflects the diverse characteristics of the Claims and Interests classified in the various Classes, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within the same Class.

34.     In addition, valid business, factual and legal reasons exist for the separate classification of Claims and Interests. For example, the Plan separates Claims from Interests and Priority Claims from both secured claims (including Secured Tax Claims and Other Secured

---

[2] In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, including Professional Fee Claims, and Priority Tax Claims have not been classified. *See* Plan, Art. III.

Claims) and General Unsecured Claims.

35.     Accordingly, the classification of Claims and Interests under the Plan is appropriate and should be approved.

### 2.     Compliance with Bankruptcy Code section 1123(a) – Mandatory Contents of the Plan

36.     Bankruptcy Code section 1123(a) requires that a chapter 11 plan: (a) designate classes of claims and interests; (b) specify unimpaired classes of claims and interests; (c) specify treatment of impaired classes of claims and interests; (d) provide for equality of treatment within each class; (e) provide adequate means for the plan's implementation; (f) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (g) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the  manner of selection of any officer, director, trustee, or their respective successors under the plan.  *See* 11 U.S.C. § 1123(a).

37.     The Plan fully complies with each requirement of Section 1123(a).  As previously noted with respect to the Plan's compliance with Bankruptcy Code section 1122, Article III of the Plan designates six (6) separate Classes of Claims and Interests, as required by Bankruptcy Code section 1123(a)(1).  Article III.B of the Plan specifies that the Claims in Classes 1–3 are unimpaired under the Plan, as required by Bankruptcy Code section 1123(a)(2) of the Bankruptcy Code. Article III.B further specifies that the Claims or Interests in Classes 4–6 are impaired and describes the treatment of each such Class in accordance with Bankruptcy Code section 1123(a)(3).  Further, as required by Bankruptcy Code section 1123(a)(4), the treatment of each Claim or Interest within a Class is either (i) the same as the treatment of each other Claim or Interest in such class or (ii) otherwise consistent with the legal rights of such claimant.

38.     In accordance with the requirements of Bankruptcy Code section 1123(a)(5), the Plan provides adequate means for its implementation through Article IV and various other provisions.  Specifically, the Plan provides for, among other things:

(a) the cancellation of all existing securities and related documents of the Debtors;

(b) the dissolution of the existing board of directors or managers, as applicable, of the Debtors;

(c) the establishment of the Liquidation Trust and the appointment of the Liquidation Trustee as the Debtors' sole officer, director, and manager, as applicable; and

(d) the exemption from certain transfer taxes.

39.     Bankruptcy Code section 1123(a)(6) requires that a debtor's corporate organizational documents prohibit the issuance of nonvoting equity securities.  The Plan does not contemplate reorganization or amended organizational documents.  Thus, this provision is not applicable to the Plan.

40.     Finally, Bankruptcy Code section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, directors, or trustee under the plan . . . ."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by Bankruptcy Code section 1129(a)(5), which directs the scrutiny of the court to the methods by which the management of the reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the reorganization — *i.e.*, creditors and equity holders.  *See* 7 Alan N. Resnick et al., COLLIER ON BANKRUPTCY ¶ 1123.01[7] (16th ed. rev. 2010).

41.     The Plan appoints the Liquidation Trustee as the Debtors' sole officer, director and manager following the Effective Date.  This appointment is consistent with the interests of creditors and equity security holders as the Debtors are liquidating and the remaining matters for

the post-Effective Date estates will involve monetizing any remaining assets, implementing the Plan transactions and winding down the Debtors' affairs and closing the Chapter 11 Cases.

### 3. Bankruptcy Code section 1123(b) – Discretionary Contents of the Plan

42.     Bankruptcy Code section 1123(b) identifies various discretionary provisions that may be included in a plan but are not required.  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.   11 U.S.C. §§ 1123(b)(1)-(2).   A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate;" (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;" (c) "the sale of all or substantially all of the property of the estate;" and (d) "the distribution of the proceeds of such sale among holders of claims or interests."  11 U.S.C. §§ 1123(b) (1-4), (6).

43.     The Plan includes various provisions that fall under the broad spectrum of Bankruptcy Code section 1123(b).  For instance, the Plan impairs Classes 4 through 6, leaving Classes 1 through 3 unimpaired.  *See* Plan, Art. III.  The Plan further provides for approval of the treatment of executory contracts and unexpired leases to which the Debtors are a party.  *See* Plan, Art. VII.

44.     In accordance with Bankruptcy Code section 1123(b)(6), the Plan includes other provisions designed to ensure its implementation that are consistent with the Bankruptcy Code, including the provisions of Article XI, regarding retention of jurisdiction by the Court over certain matters after the Effective Date.  The Debtors believe each of these provisions is appropriate under applicable law, including Bankruptcy Code sections 1123(b)(1), (3) and (6).  A further analysis of these provisions is set forth below.

### B. Bankruptcy Code Section 1129(a)(2)

45.     The Plan complies with Bankruptcy Code section 1129(a)(2), which requires that a plan proponent comply with applicable provisions of the Bankruptcy Code.  The legislative history accompanying section 1129(a)(2) indicates that the principal purpose of this section is to ensure compliance with the disclosure and solicitation requirements set forth in Bankruptcy Code section 1125.  *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("[Section] 1129(a)(2) [of the Bankruptcy Code] requires that the plan proponent comply with the adequate disclosure requirements of § 1125"); *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) ("Compliance with the disclosure and solicitation requirements is the paradigmatic example of what Congress had in mind when it enacted Section 1129(a)(2)."); *In re Texaco, Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ("[The] principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of Section 1125 in the solicitation of acceptances to the plan"); *see also* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978) ("Paragraph (2) [of Section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as Section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 (1977).

46.     The Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of section 1125 regarding disclosure and plan solicitation.  Bankruptcy Code section 1125 prohibits the solicitation of acceptances or rejections of a plan from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."  11 U.S.C. § 1125(b).  In the instant case, the Debtors solicited votes to accept the Plan from Class 4 (General Unsecured Claims), Class 5 (ARE

Subordinated Claims), and Class 6 (Interests) as such Classes are impaired.  The Debtors did not solicit votes from Classes 1, 2, and 3, as such Classes are unimpaired and presumed to accept the Plan.

47.     Pursuant to the Amended Interim Approval and Procedures Order, the Court determined on an interim basis that the Disclosure Statement contained adequate information within the meaning of Bankruptcy Code section 1125.  *See* Amended Interim Approval and Procedures Order ¶ 2.  The Court further approved the form of notice of the hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "<u>Combined Hearing Notice</u>") and the ballots for holders of claims or interests in the respective Voting Classes (the "<u>Ballots</u>").  The Court also required that the Debtors serve creditors and equity interest holders the Combined Hearing Notice and/or the appropriate Ballot, as applicable, pursuant to the Amended Interim Approval and Procedures Order.

48.     The Debtors have complied with the Amended Interim Approval and Procedures Order and caused the mailing of the Combined Hearing Notice and the Ballots to occur in accordance with the requirements of the Amended Interim Approval and Procedures Order.  *See Certificate of Service* [D.I. 189].  The Debtors further complied with all applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 1125 and Bankruptcy Rules 3017 and 3018.  Additionally, the Debtors caused the Plan, the Disclosure Statement, the Amended Interim Approval and Procedures Order, the Combined Hearing Notice, the Solicitation Procedures, and other information pertinent to voting on the Plan and responding to final approval of the Disclosure Statement and confirmation of the Plan to appear conspicuously on the main page of the website maintained by the Debtors' noticing, claims and administrative agent, KCC, in these Chapter 11 Cases.  As a result, the Plan meets the requirements of Bankruptcy Code section 1129(a)(2).

C.    **Bankruptcy Code section 1129(a)(3)**

49.    The Plan satisfies Bankruptcy Code section 1129(a)(3), which requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3). Courts consider a plan as proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *Hanson v. First Bank of S.D.*, 828 F.2d 1310, 1315 (8th Cir. 1987); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) ("for purposes of determining good faith under Section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code") (quotations and citation omitted); *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999) (explaining the good faith standard in Section 1129(a)(3) requires that there be "'some relation'" between the chapter 11 plan and the "reorganization-related purposes" that chapter 11 was designed to serve) (citations omitted); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.") (quoting *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999)) (internal quotations omitted).

50.    One must view the requirement of good faith in the context of the totality of the circumstances surrounding the formulation of a chapter 11 plan.  *See McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan."); *In re Block Shim Dev. Co.*, 939 F.2d 289, 292 (5th Cir. 1991) (finding that good faith requirement "is viewed in the context of the circumstances surrounding the plan"); *CoreStates*

*Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33, 57 (E.D. Pa. 1996) (concluding that courts must view good faith by looking at the totality of circumstances).

51.     In determining whether a plan will succeed and accomplish goals consistent with the Bankruptcy Code, courts look to the terms of the plan itself and not the proponent of the plan. *See In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good faith test provides the court with significant flexibility and is focused on an examination of the plan itself, rather than other, external factors), *aff'd in part, remanded in part on other grounds*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990); s*ee also In re Combustion Eng'g*, 391 F.3d at 246.

52.     The Debtors must show, therefore, that the Plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success. *See In re Century Glove, Inc.*, 1993 LEXIS 2286, at *15 (D. Del. Feb. 10, 1993) ("A court may only confirm a plan for reorganization if . . . 'the plan has been proposed in good faith and not by any means forbidden by law.' . . . Moreover, '[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of Section 1129(a)(3) is satisfied.'") (citations omitted); *see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (same); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984) (noting that plan provisions may not contravene any law, including state law, and a plan must have been proposed with "a basis for expecting that a reorganization can be effected") (citations omitted).

53.     The Debtors structured and proposed the Plan in a manner that effectuates the objectives and purposes of the Bankruptcy Code and the Plan is proposed in good faith. *See In re Eagle-Picher Indus.*, 203 B.R. at 274 (finding that a plan of reorganization was proposed in good

faith when, among other things, it was based on extensive arms-length negotiations among plan proponents and other parties in interest). The Plan contains no provisions that are contrary to state or other laws nor is there any indication the Debtors lack the ability to consummate the Plan. Accordingly, the Debtors submit that they have met the requirements of Bankruptcy Code section 1129(a)(3).

### D. Bankruptcy Code section 1129(a)(4)

54. The Plan also complies with Bankruptcy Code section 1129(a)(4), which states the following:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). In essence, Bankruptcy Code section 1129(a)(4) requires that any and all fees promised or received in connection with or in contemplation of a chapter 11 case must be disclosed and subject to the court's review. *See In re Crdentia Corp.*, 2010 Bankr. LEXIS 2838, at *8 (Bankr. D. Del. May 26, 2010) (holding that plan complied with Section 1129(a)(4) where all final fees and expenses payable to professionals remained subject to final review by bankruptcy court); *In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (explaining that all payments contemplated by a plan must "have been or will be" made subject to the court's approval), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987). Pursuant to the Plan and other orders of the Court, all Professional Fee Claims are subject to Court approval. *See* Plan, Art. II.A.2. Accordingly, the Plan complies with the requirements of Bankruptcy Code section 1129(a)(4).

### E. Bankruptcy Code section 1129(a)(5)

55. The Debtors are not reorganizing under the Plan and accordingly, the appointment

of the Liquidation Trustee as the Debtors' sole officer, director, and manager, as applicable, is consistent with Bankruptcy Code section 1129(a)(5).

### F.    Bankruptcy Code section 1129(a)(6)

56.    Bankruptcy Code section 1129(a)(6) is inapplicable to the Debtors, as it requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129 (a)(6). The Debtors' business has no involvement with the establishment of rates over which any regulatory commission has jurisdiction or will have jurisdiction after the Plan's confirmation.  Accordingly, Bankruptcy Code section 1129(a)(6) is inapplicable to the Debtors.

### G.    Bankruptcy Code section 1129(a)(7)

57.    The Plan satisfies the "best interests of creditors" test set forth in Bankruptcy Code section 1129(a)(7).  This test requires that, with respect to each impaired class of claims or interests, each holder of such claims or interests (a) has accepted the plan or (b) will receive or retain property of a value not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  *See In re Armstrong World Indus.*, 348 B.R. at 165-66; *see also In re Tranel*, 940 F.2d 1168, 1172 (8th Cir. 1991) (considering evidence supporting best interests of creditors test outcome); *In re AOV Indus.*, 31 B.R. 1005, 1008-13 (D.D.C. 1983) (if no impaired creditor receives less than liquidation value, plan of reorganization is in best interests of creditors), *aff'd in part, rev'd in part*, 792 F.2d 1140, 1144 (D.C. Cir. 1986), *vacated in light of new evidence*, 797 F.2d 1004 (D.C. Cir. 1986); *In re Econ. Lodging Sys., Inc.*, 205 B.R. 862, 864-65 (Bankr. N.D. Ohio 1997) (analyzing evidence relating to best interests of creditors test); *In re Eagle-Picher Indus.*, 203 B.R. at 266 (best interest of creditors test must be met even in cramdown situation).  A court, in considering whether a plan is in the "best interests"

of creditors, is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all the debtor's assets under chapter 7 of the Bankruptcy Code. *See, e.g.*, *In re Victory Constr. Co.*, 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990); *In re Jartran, Inc.*, 44 B.R. 331, 389-93 (Bankr. N.D. Ill. 1984) (best interests test satisfied by showing that, upon liquidation, cash received would be insufficient to pay priority claims and secured creditors so that unsecured creditors and equity holders would receive no recovery).

58.     The first step in meeting the best interests test is to determine the proceeds that the hypothetical liquidation of a debtor's assets and properties would generate in the context of a liquidation under chapter 7 of the Bankruptcy Code. The gross amount available would be the sum of the proceeds from liquidating the debtor's assets plus the cash held by the debtor at the time of commencement of the hypothetical case under chapter 7 of the Bankruptcy Code. The amount of any claims secured by these assets, the costs and expenses of the liquidation, and any additional administrative expenses and priority claims that may result from the termination of the debtor's business and the use of chapter 7 of the Bankruptcy Code for the purposes of a hypothetical liquidation would reduce the amount of these proceeds. Any remaining net cash would be allocated to creditors and equity interest holders in strict priority in accordance with Bankruptcy Code section 726.

59.     The Debtors submit that liquidation under chapter 7 of the Bankruptcy Code would result in significantly smaller, if any, distributions to holders of Claims and Interests than those provided for in the Plan because of (a) the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) the inability of a chapter 7 trustee to

maximize the return to the Debtors' creditors to the same degree as set forth in the Plan.

60.    Specifically, as described in the hypothetical Liquidation Analysis attached to the Disclosure Statement as Exhibit B, the Debtors assumed that any liquidation of their assets would be accomplished through conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about June 7, 2024.  On the hypothetical conversion date, it is assumed that the Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' major assets would be sold or distributed, and the cash proceeds, net of liquidation related costs, would then be distributed to creditors in accordance with relevant law.  There could be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.

61.    Additionally, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such trustee would engage.  Moreover, the foregoing types of claims and other claims that might arise in a chapter 7 liquidation case (including claims from potentially redundant activities that could be engaged in by a chapter 7 trustee) or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Chapter 11 Cases such as compensation for attorneys and financial advisors, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available for distributions to other creditors.

62.    After considering the effects that a liquidation under chapter 7 of the Bankruptcy Code would have on the ultimate proceeds available for distribution to the holders of Claims and Interests in the Chapter 11 Cases, including (a) the decrease in value caused by a chapter 7

liquidation of the Debtors' assets, (b) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, and (c) the costs of a corporate wind-down of operations, the Debtors assert that confirmation of the Plan will provide each holder of a Claim with a recovery that is not less than what such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Indeed, no party has objected to confirmation under the "best interests" test.  Thus, the Debtors submit that they have satisfied the requirements of Bankruptcy Code section 1129(a)(7).

       **H.**     **Bankruptcy Code section 1129(a)(8)**

63.     Bankruptcy Code Section 1129(a)(8) requires that "with respect to each class of claims or interests — (A) such class has accepted the plan or (B) such class is not impaired under the Plan." 11 U.S.C. § 1129(a)(8).  Pursuant to Bankruptcy Code section 1126(c), a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class vote to accept the plan.  11 U.S.C. § 1126(c).  Pursuant to Bankruptcy Code section 1126(d), a class of interests accepts a plan if at least two-thirds in amount of allowed interests in that class vote to accept the plan.  11 U.S.C. § 1126(d).

64.     As set forth above, the holders of Claims in Classes 1 through 3 are unimpaired under the Plan and, pursuant to Bankruptcy Code section 1126(f), are conclusively presumed to have voted to accept the Plan.  Thus, the requirements of section 1129(a)(8) have been satisfied as to each of Classes 1 through 3.

65.     As set forth above and in the Voting Declaration, the holders of Claims in Class 4 (General Unsecured Claims), Class 5 (ARE Subordinated Claims), and Class 6 (Interests) voted to accept the Plan.  Thus, as to the impaired and accepting Classes, the requirements of section 1129(a)(8) likewise have been satisfied.

## I.     Bankruptcy Code section 1129(a)(9)

66.     The Plan satisfies Bankruptcy Code section 1129(a)(9), which requires that a chapter 11 plan provide for the payment of certain priority claims in full on the effective date in the allowed amount of such claims.    In particular, pursuant to Bankruptcy Code section 1129(a)(9)(A), unless otherwise agreed by the holder, holders of claims of a specific kind specified in Bankruptcy Code section 507(a)(1) — administrative claims allowed under Bankruptcy Code section 503(b) — must receive cash equal to the allowed amount of such claims on the effective date of a plan.  11 U.S.C. § 1129(a)(9)(A).  Bankruptcy Code section 1129(a)(9)(B) further requires that the holders of claims of a kind specified in Bankruptcy Code sections 507(a)(1) and 507(a)(4) through (7) (generally, wage and employee benefit claims and consumer deposits that are entitled to priority) must receive, if the class in which such claimants are members has accepted the plan, deferred cash payments of a value equal to the allowed amount of these claims or, if the class in which such claimants are members has not accepted the plan, cash equal to the allowed amount of these claims on the effective date of a plan.  *See id.* § 1129(a)(9)(B).  Finally, Bankruptcy Code sections 1129(a)(9)(C) and (D) provide for the payment of priority tax claims, including secured claims that would otherwise meet the requirements of Bankruptcy Code section 507(a)(8) absent the secured status of such claims, in cash in regular installments.  *See id.* § 1129(a)(9)(C) and (D).

67.     In accordance with Bankruptcy Code section 1129(a)(9)(A), Article II of the Plan provides that, unless otherwise agreed by the holder of an Administrative Claim or an order of the Court provides otherwise, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the earlier of the date that is (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date.  Similarly, unless otherwise agreed by the holder

of an Allowed Professional Fee Claim, or an order of the Court provides otherwise, each holder of an Allowed Professional Fee Claim shall promptly receive any unpaid portion of such Allowed Professional Fee Claim from the Professional Fee Claim Reserve upon entry of a Final Order approving any application for a Professional Fee Claim.

68.     In accordance with Bankruptcy Code section 1129(a)(9)(B), Article II.B of the Plan provides that each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided by Bankruptcy Code section 511; or (ii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Court.

69.     In accordance with Bankruptcy Code section 1129(a)(9)(C), Article III.C.3 of the Plan provides that the holder of any such Other Priority Claim shall receive Cash equal to the amount of such Allowed Other Priority Claim from the Liquidation Trustee or such other treatment rendering such holder's Allowed Other Priority Claim Unimpaired.

70.     Accordingly, the Plan satisfies the requirements set forth in Bankruptcy Code section 1129(a)(9).

**J.      Bankruptcy Code section 1129(a)(10)**

71.     Bankruptcy Code section 1129(a)(10) provides the following:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); *see also In re Martin*, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (holding that acceptance by three classes of impaired creditors, exclusive of insiders, satisfied requirement

of Section 1129(a)(10)).   As set forth in the Voting Declaration, Class 4 (General Unsecured Claims), Class 5 (ARE Subordinated Claims), and Class 6 (Interests) voted to accept the Plan.   The Voting Declaration identifies three votes which were not included in the tabulation of votes, as the holders of those Class 4 Claims are insiders.   *See* Voting Declaration, Exhibit B.   Accordingly, the Debtors submit that the requirements of Bankruptcy Code section 1129(a)(10) are satisfied because the Plan received broad support and was accepted by at least one impaired class for which votes were cast.

### K.      Bankruptcy Code section 1129(a)(11)

72.      The Plan satisfies Bankruptcy Code section 1129(a)(11), which provides that a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan."   11 U.S.C. § 1129(a)(11).   One leading commentator has stated that this section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable."   COLLIER ON BANKRUPTCY at ¶ 1129.03[11]; *accord In re Aleris Int'l, Inc.*, 2010 Bankr. LEXIS 2997, at *27 (Bankr. D. Del. May 3, 2010) ; *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994); *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994); *In re Johns-Manville*, 68 B.R. at 635.

73.      Section 1129(a)(11), however, does not require a guarantee of the plan's success; rather, the proper standard is whether the plan offers a "reasonable assurance" of success.   *See, e.g.*, *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d at 649 (noting plan may be feasible although its success is not guaranteed); *Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir. 1985) (same); *In re Rivers End Apartments*, 167 B.R. at 476 (to establish feasibility, "a [plan] proponent must demonstrate that its plan offers 'a reasonable prospect of success' and is workable"); *In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr.

E.D. Mo. 1990) (guarantee of success is not required to meet feasibility standard of section 1129(a)([11])); *In re Elm Creek Joint Venture*, 93 B.R. 105, 110 (Bankr. W.D. Tex. 1988) (a guarantee of success is not required under Section 1129(a)(11), only reasonable expectation that payments will be made); *In re Texaco, Inc.*, 84 B.R. at 910 ("All that is required is that there be reasonable assurance of commercial viability.").

74.     Since the Plan expressly provides for the liquidation of the Debtors' assets, Bankruptcy Code section 1129(a)(11) is satisfied.  *See In re Revco*, 131 B.R. 615, 622 (Bankr. N.D. Ohio 1990) (holding that "[s]ection 1129(a)(11) is satisfied as the plan provides that the property of [the] Debtors shall be liquidated").  As a result, confirmation of the Plan is not likely to be followed by a further financial reorganization of the Debtors.  Accordingly, the Plan satisfies Bankruptcy Code section 1129(a)(11).

**L.     Bankruptcy Code section 1129(a)(12)**

75.     The Plan complies with Bankruptcy Code section 1129(a)(12), which requires that, as a condition precedent to the confirmation of a plan, "[a]ll fees payable under Section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."  11 U.S.C. § 1129(a)(12).  The Plan and the proposed Confirmation Order specifically provide that all fees payable pursuant to Section 1930 of Title 28 of the United States Code will be paid as required and all fees due and owing will be paid on or prior to the Effective Date.  *See* Plan*, Art. II.C; Confirmation Order ¶ 24.  As such, the Debtors are in compliance with Bankruptcy Code section 1129(a)(12).

**M.     Bankruptcy Code section 1129(a)(13)**

76.     Bankruptcy Code section 1129(a)(13) is inapplicable to the Plan, as it requires that a plan of reorganization provide for the continuation of all retiree benefits at the level established

by agreement or by court order pursuant to Bankruptcy Code section 1114 at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits. The Debtors have no retiree benefits plans. Accordingly, Bankruptcy Code section 1129(b)(13) is inapplicable to the Plan.

## II.   Bankruptcy Code Section 1129(b)

77.     Bankruptcy Code section 1129(b)(1) allows for confirmation of a plan in cases where all requirements of Bankruptcy Code section 1129(a) are met other than section 1129(a)(8) (*i.e.*, the plan has not been accepted by all impaired classes of claims or interests), by allowing a court to "cram down" the plan notwithstanding objections or deemed rejections as long as the court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the rejecting classes. 11 U.S.C. § 1129(b)(1).

78.     The Debtors need not meet the "cram down" requirements of Bankruptcy Code section 1129(b) to confirm the Plan, as none of the Voting Classes are deemed to reject the Plan or have voted to reject the Plan. In any event, the Plan is fair and equitable and does not discriminate unfairly with respect to holders of Claims or Interests in any Class.

### A.     The Plan Is Fair and Equitable with Respect to All Impaired Classes

79.     Bankruptcy Code section 1129(b)(2) provides that a plan is fair and equitable, with respect to a class of unsecured claims, if the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim and, with respect to a class of interests, if the plan provides that each older of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest. 11 U.S.C. § 1129(b)(2).

80.    The Plan contemplates payment in full to all holders of Allowed Class 4 General Unsecured Claims and Class 5 ARE Subordinated Claims.  Further, the Plan provides for a pro rata recovery to equity interest holders with an Allowed Interest equal to the value of such interest. Accordingly, the Plan is fair and equitable with respect to holders of Claims and Interests in Class 4 (General Unsecured Claims), Class 5 (ARE Subordinated Claims), and Class 6 (Interests).

**B.    The Plan Does Not Discriminate Unfairly with Respect to the Impaired Classes**

81.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.  *See In re 203 N. LaSalle*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a chapter 11 plan" and that "the limits of fairness in this context have not been established"); *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"). *See also In re Armstrong World Indus.*, 348 B.R. at 121-22 (relying heavily on the facts of the case to determine whether the plan unfairly discriminated against certain classes).

82.    In general, courts have held that a plan unfairly discriminates in violation of Bankruptcy Code section 1129(b) only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.  *See, e.g.*, *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re*

*Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 655-56 (9th Cir. 1997) (same); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989) (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).  A threshold inquiry in assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to the class allegedly receiving more favorable treatment.  *See In re Armstrong World Indus.*, 348 B.R. at 121.

83.    No Holder of a Claim or Interest in any Class has raised a concern that the Plan fails to satisfy the absolute priority rule.  The Claims and Interests in Classes 4, 5 and 6 are all subordinate to the priority of the Claims in Classes 1 through 3.  The Plan provides for the same treatment by the Debtors of all holders of Claims and Interests within each of these three Classes.  Thus, the Plan does not discriminate unfairly with respect to holders of Claims or Interests in Class 4 (General Unsecured Claims), Class 5 (ARE Subordinated Claims) and Class 6 (Interests) and is fair, equitable and reasonable with respect to such impaired Classes.  Accordingly, the Plan should be confirmed.

III.    **Section 1129(c) – No Other Plan Has Been Proposed or Confirmed**

84.    The Plan satisfies Bankruptcy Code section 1129(c), which provides that, with a limited exception, a bankruptcy court may only confirm one plan.  The Plan is the only plan that has been filed in these Chapter 11 Cases and is the only plan that satisfies the requirements of subsections (a) and (b) of Bankruptcy Code section 1129.  Accordingly, the requirements of

Bankruptcy Code section 1129(c) are satisfied.

**IV.    Section 1129(d) – The Plan's Purpose Is Consistent with the Bankruptcy Code**

85.    The Plan satisfies Bankruptcy Code section 1129(d), which provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933.  In the instant case, the Plan's principal purpose is not the avoidance of taxes or the avoidance of the requirements of Section 5 of the Securities Act of 1933, and there has been no filing by any governmental agency asserting the contrary.  Accordingly, the Plan complies with Bankruptcy Code section 1129(d).

## OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE

**I.    The Plan's Releases and Exculpation Provisions Are Appropriate and Should Be Approved**

86.     Article VIII.C of the Plan provides for the releases by the Debtors of the Released Parties (the "Debtor Releases").  The Plan also includes in Article VIII.B a customary exculpation and limitation of liability provision (the "Exculpation Provision").

### A.    The Debtor Releases

87.    The Debtor Releases appropriately are tailored under the facts and circumstances of these Chapter 11 Cases and are supported by adequate consideration.  The Debtor Releases are an integral part of the Plan and provide appropriate levels of protection to the Released Parties.  Accordingly, the Debtor Releases represent the sound and valid exercise of the Debtors' business judgment and are permissible under Bankruptcy Code section 1123(b)(6).

88.    In evaluating releases, courts distinguish between a debtor's release of non-debtors and third parties' release of non-debtors.  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Exide Techs.*, 303 B.R. 48, 71-74 (Bankr. D. Del. 2003)). With respect to a debtor's release of non-debtors, courts in the Third Circuit consider the following five *Zenith*

factors:

> (a) An identity of interest between the debtor and third-party, such that a suit against the third-party is, in essence, a suit against the debtor or will deplete the assets of the estate;

> (b) Substantial contribution by the third-party to the plan;

> (c) The essential nature of the release to the debtor's plan;

> (d) An agreement by a substantial majority of creditors to support the plan and the release; and

> (e) Provision in the plan for payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*In re Zenith*, 241 B.R. at 110; *see also In re Wash. Mut., Inc.*, 442 B.R. at 314. No factor is dispositive, nor is a proponent required to establish each factor required for the release to be approved; rather the factors are intended to provide guidance to the Court in determining the fairness of the releases. *In re Wash. Mut., Inc.*, 442 B.R. at 346; *see also In re Exide Techs.*, 303 B.R. at 72 (finding that the factors are not exclusive or conjunctive requirements); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (approving debtors' releases despite not meeting the third and fifth *Zenith* factors).

89. The Debtor Releases pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment, and the Debtors have satisfied the business judgment standard in granting such releases under the Plan. The Debtors' directors and officers have each substantially contributed to the Chapter 11 Cases. The Debtors' directors, officers and employees also substantially contributed to these cases by assisting with the Sale Process and Plan process to maximize value for the estates. Moreover, the Debtors' directors and officers are entitled to indemnification from the Debtors in the event that any such directors and officers are required to defend against or is found liable for a released claim.

90. The Debtor Releases meet the applicable standard because they are fair, reasonable

and in the best interests of the Debtors' estates.  The Debtor Releases are important to the Plan as a whole as well as to the numerous compromises negotiated in these Chapter 11 Cases and implemented in the Plan, which will ultimately result in the Debtors making meaningful distributions to certain of their creditors that would otherwise not be possible.

91.     Second, and perhaps more importantly, the Debtors do not believe they are releasing any material claims.  As such, pursuing non-material claims against the Released Parties is not in the best interests of the Debtors' various constituencies as the costs involved likely would outweigh any potential benefits from pursuing such claims.  The Debtors' management reviewed, considered and approved such releases.  Thus, reviewing the *Zenith* factors in their totality, the Debtor Releases are fair and reasonable and should be approved as a valid exercise of the Debtors' business judgment.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 142 (Bankr. D. Del. 2010) (approving as a valid exercise of business judgment the debtors' releases of, among others, the debtors' current directors, officers and employees, the debtors' current and former professionals, secured creditors and their advisors, the debtors and their affiliates, and their officers, directors, employees, and advisors and senior noteholders and their advisors) (citing *In re DBSD North America, Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (approving a debtor's release of third parties when the debtor testified that it was unaware of any significant potential claims that were being released).

## B.     The Exculpation Provision

92.     The proposed Exculpation Provision is appropriate based on the limitation of liability provided in Bankruptcy Code section 1125(e).  That section provides:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate

> participating in a joint plan with the debtor, or of a newly organized
> successor to the debtor under the plan, is not liable, on account of
> such solicitation or participation, for violation of any applicable law,
> rule, or regulation governing solicitation of acceptance or rejection
> of a plan or the offer, issuance, sale, or purchase of securities.

11 U.S.C. § 1125(e).  This statutory limitation of liability encompasses the matters listed in the proposed Exculpation Provision in Article VIII.B of the Plan.  *See In re HSH Del. GP LLC*, Case No. 10-10187 (MFW) (Bankr. D. Del. Jan. 18, 2011) (confirming plan that provided exculpation to, among others, debtors' lenders and stating that provision was "appropriate under [Bankruptcy Code Section] 1125(e)" because it was "limited to the activities so far in the Chapter 11" and only related to prospective acts in connection with execution and implementation of plan).  Accordingly, the Court has authority and should approve the Exculpation Provision as appropriate under Bankruptcy Code section 1125(e).

93.      The Plan's Exculpation Provision complies with the Bankruptcy Code and is of the type typically afforded to debtors, estate fiduciaries and third parties that participated in the plan process.  Article VIII.B of the Plan is narrowly tailored to limit the liability of the Debtors and the Exculpated Parties in connection with, relating to, or arising out of these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or implementation of the Plan and its related documents, the solicitation of acceptances of the Plan, the filing of these Chapter 11 Cases; any postpetition act taken or omitted to be taken in connection with these Chapter 11 Cases; the pursuit of confirmation and consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan.  *See* Plan, Art. VIII.B.  The proposed Exculpation Provision does not, consistent with Third Circuit precedent, affect any liability that is determined to have constituted gross negligence, fraud or willful misconduct.  *Id.*; *In re PWS Holding.,* 228 F.3d at 245-46 (holding that exculpation provision must not eliminate liability arising from willful misconduct or gross negligence).  The Court should approve the Exculpation Provision in Article

VIII.B of the Plan because it is consistent with: (i) the limitation of liability contained in Bankruptcy Code section 1125(e) and (ii) similar provisions approved by this Court.

## II.      Substantive Consolidation of the Debtors' Estates

94.      The Plan serves as a motion by the Debtors to substantively consolidate all of the estates of the Debtors into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan.  *See* Plan, Art. VI.  Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors.  *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).  The Third Circuit in *Owens Corning* discussed at length substantive consolidation in bankruptcy proceedings, as well as its genesis and the impact it has on debtors' creditors and their rights and recoveries. The court provided the following baseline standards for approval of non-consensual substantive consolidation, while leaving the trial court with discretion to assess what facts are necessary to meet these standards:

> (i) prepetition [the debtors] disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.* at 211.  Courts in this District have clarified that substantive consolidation is also appropriate where the parties consent to it.  *See Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009).

95.      This consolidation shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all of the Debtor Entities shall continue to exist as separate

legal entities.   Nor will the Plan's proposed substantive consolidation adversely impact the treatment of the Debtors' creditors.   Instead, substantive consolidation pursuant to the Plan will allow for greater efficiencies and simplification in administration, and thus, will reduce expenses by decreasing the administrative difficulties and costs related to the administration of and distributions from the Debtors' estates

96.      In addition, the Debtors' creditors, stakeholders and other parties in interest will benefit from the partial substantive consolidation.   Given the potential expense of making distributions on an unconsolidated basis for each of the Debtors, the Debtors believe that the overall effect of the partial substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in administering distributions under the Plan.   Accordingly, the Debtors believe that substantive consolidation of the Debtors' estates under the terms of the Plan will not adversely impact the treatment of the Debtors' creditors, but rather will reduce expenses by decreasing the administrative difficulties and costs related to the distribution of the Debtors' estates separately.

97.      As set forth above, substantive consolidation in these Chapter 11 Cases is appropriate and consistent with Third Circuit precedent.   First and foremost, substantive consolidation of the Debtors' estates as requested is consensual, as not a single creditor has objected, which alone is a sufficient basis for such relief.   Therefore, substantive consolidation of the estates of the Debtors pursuant to the provisions of the Plan with respect thereto should be approved.

## **WAIVER OF STAY**

98.      The Debtors respectfully request that the Court cause the Confirmation Order to become effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e), which states that "[a]n order confirming a plan is stayed

until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P 3020(e); *see also* Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend. (stating that a "court may, <u>in its discretion</u>, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately") (emphasis added).  According to the Advisory Committee notes to the 1999 amendments to the Bankruptcy Rules, the purpose of Bankruptcy Rule 3020(e) is to permit a party in interest to request a stay of the confirmation order pending appeal before the plan is implemented and an appeal becomes moot.  Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.  To the extent a party wishes to seek an appeal, it may seek to stay the effectiveness of the Confirmation Order in connection with the appeal.[3]  As a result, the Debtors respectfully request that the Court cause the Confirmation Order to become effective immediately upon its entry.

## **CONCLUSION**

99.     For the reasons set forth in this Memorandum of Law, the Debtors respectfully submit that: (a) the Disclosure Statement and the Plan fully satisfy all applicable requirements of the Bankruptcy Code; (b) the Disclosure Statement should be approved on a final basis and the Plan should be confirmed by the Court; and (c) the 14-day stay of the Confirmation Order should be waived.

---

[3] If for some reason a party in interest appeals the Confirmation Order, such party is on notice that the Debtors are asking the Court for a waiver of the stay imposed by Bankruptcy Rule 3020(e).  Therefore, such party is on notice that it must request a stay pending appeal immediately after the entry of the Confirmation Order.  *See, e.g.*, *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 187 (3d Cir. 2001) (noting that all parties were on notice that plan called for "Immediate Effectiveness," allowing appellants the opportunity to seek stay immediately upon confirmation of plan).

Dated: June 17, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Joshua B. Brooks*
Matthew B. McGuire (No. 4366)
Joshua B. Brooks (No. 6765)
George A. Williams III (No. 6964)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: mcguire@lrclaw.com
      brooks@lrclaw.com
      williams@lrclaw.com

*Counsel for the Debtors and Debtors-In-Possession*